## BUTTFIELD *v.* STRANAHAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 294. Argued January 4, 1904.—Decided February 23, 1904.

Every intendment is in favor of the validity of a statute and it must be presumed to be constitutional unless its repugnancy to the Constitution clearly appears.

The power of Congress to regulate foreign commerce, being an enumerated power, is complete in itself, acknowledging no limitations other than those prescribed in the Constitution, and Congress can, without violating the due process clause, establish standards and provide from considerations of public policy that no right shall exist to import an article of food not equal thereto. No individual has a vested right to trade with foreign nations superior to the power of Congress to determine what, and upon what terms, articles may be imported into the United States.

Where a statute acts on a subject as far as practicable and only leaves to executive officials the duty of bringing about the result pointed out, and

provided for it is not unconstitutional as vesting executive officers with legislative powers. *Field* v. *Clark*, 143 U. S. 649.

The act of March 2, 1897, 29 Stat. 604, to prevent the importation of impure and unwholesome tea is not unconstitutional either because. the power conferred to establish standards is legislative and cannot be delegated by Congress to administrative officers; because persons affected thereby have a vested interest to import teas which are in fact pure though below the standard fixed; because the establishment of and enforcement of the standard qualities constitutes a deprivation of property without due process of law; because it does not provide for notice and opportunity to. be heard before the rejection of the tea; or, because the power to destroy goods upon the expiration of the time limit without a judicial proceeding is a condemnation and taking of property without due process of law.

THIS case presents for determination the question of the constitutionality of a statute known as the tea inspection act, approved March 2, 1897, 29 Stat. 604. The act is copied in full in the margin.[1]

---

[1] An Act To prevent the importation of impure and unwholesome tea.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after May first, eighteen hundred and ninety-seven, it shall be unlawful for any person or persons or corporation to import or bring into the United States any merchandise as tea which is inferior in purity, quality, and fitness for consumption to the standards provided in section three of this act, and the importation of all such merchandise is hereby prohibited.

SEC. 2. That immediately after the passage of this act, and on or before February fifteenth of each year thereafter, the Secretary of the Treasury shall appoint a board, to consist of seven members, each of whom shall be an expert in teas, and who shall prepare and submit to him standard samples of tea; that the persons so appointed shall be at all times subject to removal by the said Secretary, and shall serve for the term of one year; that vacancies in the said board occurring by removal, death, resignation, or any other cause shall be forthwith filled by the Secretary of the Treasury by appointment, such appointee to hold for the unexpired term; that said board shall appoint a presiding officer, who shall be the medium of all communications to or from such board; that each member of said board shall receive as compensation the sum of fifty dollars per annum, which, together with all necessary expenses while engaged upon the duty herein provided, shall be paid out of the appropriation for "expenses of collecting the revenue from customs."

SEC. 3. That the Secretary of the Treasury, upon the recommendation of

On January 20, 1902, eight packages of tea were imported into the port of New York, per the steamer Adana, by a firm of which the plaintiff in error was the general partner. The tea was entered for import at the New York custom-house,

---

the said board, shall fix and establish uniform standards of purity, quality, and fitness for consumption of all kinds of teas imported into the United States, and shall procure and deposit in the custom-houses of the ports of New York, Chicago, San Francisco, and such other ports as he may determine, duplicate samples of such standards; that said Secretary shall procure a sufficient number of other duplicate samples of such standards to supply the importers and dealers in tea at all ports desiring the same at cost. All teas, or merchandise described as tea, of inferior purity, quality, and fitness for consumption to such standards shall be deemed within the prohibition of the first section hereof.

SEC. 4. That on making entry at the custom-house of all teas, or merchandise described as tea, imported into the United States, the importer or consignee shall give a bond to the collector of the port that such merchandise shall not be removed from the warehouse until released by the collector, after it shall have been duly examined with reference to its purity, quality, and fitness for consumption; that for the purpose of such examination samples of each line in every invoice of tea shall be submitted by the importer or consignee to the examiner, together with the sworn statement of such importer or consignee that such samples represent the true quality of each and every part of the invoice and accord with the specifications therein contained; or in the discretion of the Secretary of the Treasury, such samples shall be obtained by the examiner and compared by him with the standards established by this act; and in cases where said tea, or merchandise described as tea, is entered at ports where there is no qualified examiner as provided in section seven, the consignee or importer shall in the manner aforesaid furnish under oath a sample of each line of tea to the collector or other revenue officer to whom is committed the collection of duties, and said officer shall also draw or cause to be drawn samples of each line in every invoice and shall forward the same to a duly qualified examiner as provided in section seven: *Provided, however,* That the bond above required shall also be conditioned for the payment of all custom-house charges which may attach to such merchandise prior to its being released or destroyed (as the case may be) under the provisions of this act.

SEC. 5. That if, after an examination as provided in section four, the tea is found by the examiner to be equal in purity, quality, and fitness for consumption to the standards hereinbefore provided, and no reëxamination shall be demanded by the collector as provided in section six, a permit shall at once be granted to the importer or consignee declaring the tea free from

and was stored in a bonded warehouse. At that time certain standards, enumerated in the margin,[2] which were selected by the board of tea inspectors, had been put in force by the Treasury regulations under said act of March 2, 1897.

---

the control of the custom authorities; but if on examination such tea, or merchandise described as tea, is found, in the opinion of the examiner, to be inferior in purity, quality, and fitness for consumption to the said standards the importer or consignee shall be immediately notified, and the tea, or merchandise described as tea, shall not be released by the custom-house, unless on a reëxamination called for by the importer or consignee the finding of the examiner shall be found to be erroneous: *Provided,* That should a portion of the invoice be passed by the examiner, a permit shall be granted for that portion and the remainder held for further examination, as provided in section six.

SEC. 6. That in case the collector, importer or consignee shall protest against the finding of the examiner, the matter in dispute shall be referred for decision to a board of three United States general appraisers, to be designated by the Secretary of the Treasury, and if such board shall, after due examination, find the tea in question to be equal in purity, quality, and fitness for consumption to the proper standards, a permit shall be issued by the collector for its release and delivery to the importer; but if upon such final reëxamination by such board the tea shall be found to be inferior in purity, quality, and fitness for consumption to the said standards, the importer or consignee shall give a bond, with security satisfactory to the collector, to export said tea or merchandise described as tea, out of the limits of the United States within a period of six months after such final reëxamination; and if the same shall not have been exported within the time specified, the collector, at the expiration of that time, shall cause the same to be destroyed.

---

[2] No. 1. Formosa Oolong.
No. 2. Foochon Oolong.
No. 3. North China Congon.
No. 4. South China Congon.
No. 5. India Tea (used for Ceylon tea).
No. 6. Pingsuey, green tea.
No. 7. Country green tea.
No. 8. Japan tea, pan fried (used for sun dried).
No. 9. Japan tea, basket fried.
No. 10. Japan tea, dust or fannings.
No. 11. Capers (used for scented orange Pekoe).
No. 12. Canton Oolong (*a*).
No. 13. Scented Canton (*a*).

The eight packages of tea in question were embraced in the class known as "Country green teas," numbered 7 on list of standards. The tea was examined on February 7, 1902, and was rejected as "inferior to standard in quality." By the

---

SEC. 7. That the examination herein provided for shall be made by a duly qualified examiner at a port where standard samples are established, and where the merchandise is entered at ports where there is no qualified examiner, the examination shall be made at that one of said ports which is nearest the port of entry, and that for this purpose samples of the merchandise, obtained in the manner prescribed by section four of this act, shall be forwarded to the proper port by the collector or chief officer at the port of entry; that in all cases of examination or reëxamination of teas, or merchandise described as tea, by examiners or boards of United States general appraisers under the provisions of this act, the purity, quality, and fitness for consumption of the same shall be tested according to the usages and customs of the tea-trade, including the testing of an infusion of the same in boiling water, and, if necessary, chemical analysis.

SEC. 8. That in cases of reëxamination of teas, or merchandise described as teas, by a board of United States general appraisers in pursuance of the provisions hereof, samples of the tea, or merchandise described as tea, in dispute, for transmission to such board for its decision, shall be put up and sealed by the examiner in the presence of the importer or consignee if he so desires, and transmitted to such board, together with a copy of the finding of the examiner, setting forth the cause of condemnation and the claim or ground of the protest of the importer relating to the same, such samples, and the papers therewith, to be distinguished by such mark that the same may be identified; that the decision of such board shall be in writing, signed by them, and transmitted, together with the record and samples, within three days after the rendition thereof, to the collector, who shall forthwith furnish the examiner and the importer or consignee with a copy of said decision or finding. The board of United States general appraisers herein provided for shall be authorized to obtain the advice, when necessary, of persons skilled in the examination of teas, who shall each receive for his services in any particular case a compensation not exceeding five dollars.

SEC. 9. That no imported teas which have been rejected by a customs examiner or by a board of United States general appraisers, and exported under the provisions of this act, shall be reimported into the United States under the penalty of forfeiture for a violation of this prohibition.

SEC. 10. That the Secretary of the Treasury shall have the power to enforce the provisions of this act by appropriate regulations.

SEC. 11. That teas actually on shipboard for shipment to the United States at the time of the passage of this act shall not be subject to the prohibition hereof, but the provisions of the act entitled "An act to prevent the impor-

term quality as thus used was meant the cup quality of the tea, that is to say, its taste and flavor. An appeal was taken by the importer to the board of general appraisers, and that board, on March 10, 1902, certified to the collector that "the said tea is inferior in quality to the standard prescribed by law," and accordingly overruled the appeal. The firm was notified of the decision on March 12, 1902.

In November following the plaintiff in error—who had acquired the interest of his partner in the tea—applied to the collector for permission to withdraw the tea for consumption, on payment of the duties. The request was refused. Application was then made for the release of the tea from bond in order to export it. This was also refused on the ground that the tea had been finally rejected under the act of March 2, 1897, more than six months previous to the application. The plaintiff in error was also notified that the tea would be ordered to the public stores for destruction.

This action was commenced in the Supreme Court of the State of New York, county of New York, against the collector of the port of New York, to recover damages for the alleged wrongful seizure, removal and destruction of the tea in question. Averments were made of the importation, storing, tender of duties and refusal to accept the same, and of demand for the tea and refusal to deliver. A general denial was filed. The action being on account of acts done by the defendant under the revenue laws of the United States, as collector of customs, it was removed on his application to the Circuit Court of the United States for the Southern District of New York.

---

tation of adulterated and spurious teas," approved March second, eighteen hundred and eighty-three, shall be applicable thereto.

SEC. 12. That the act entitled "An act to prevent the importation of adulterated and spurious teas," approved March second, eighteen hundred and eighty-three, is hereby repealed, such repeal to take effect on the date on which this act goes into effect.

Approved, March 2, 1897.

At the trial of the case before Circuit Judge Coxe and a jury, the exhibit reproduced in the margin was introduced in evidence.[1]

[1] EXHIBIT No 8.

*Schedule of Country Green Teas arranged in Order of Quality.*

| No. | Moyune | Teenkai | Fychow | Wenchow | Notes |
|---|---|---|---|---|---|
| 1 | Choicest Moyune | Choicest Teenkai | | | |
| 2 | Choice Moyune | Choice Teenkai | | | |
| 3 | Finest Moyune | Finest Teenkai | | | |
| 4 | Fine to Finest Moyune | Fine to Finest Teenkai | | | |
| 5 | Fine Moyune | | | | |
| 6 | On Fine Moyune | Fine Teenkai | | | |
| 7 | Fully Good Medium Moyune | On Fine Teenkai | Finest Fychow | Finest Wenchow | |
| 8 | Good Medium Moyune | Fully Good Medium Teenkai | Fine " | Fine " | |
| 9 | On Good Medium Moyune | Good Medium Teenkai | Good Medium Fychow | Good Med. " | |
| 10 | Fair Moyune | On Good Teenkai | Fair " | Good Common | |
| 11 | Good Common Moyune | Fair Teenkai | Good Common " | Fair " | |
| 12 | Common Moyune | Good Common Moyune | | Good Common | Good, clean, genuine Shanghai packed |
| 13 | | Common Teenkai | Common | Good Common Wenchow | |
| 14 | | | | Good Common Wenchow | |
| 15 | | | | Common Wenchow | |
| 16 | | | | | Mixed, Shanghai packed |
| 17 | | | | | Common, refined and adulterated Shanghai packed |

As indicated on this exhibit, the Country green teas thereon designated were arranged in their order of quality, from the highest to the lowest, No. 1 being the highest grade, and No. 17 the lowest. The designation in each perpendicular column represented the teas grown in a particular district, and all the teas enumerated on the same horizontal line were considered as being equal in grade.

The chairman of the Board of Tea Experts of the Treasury Department testified that the standard for Country green teas in force at the time the tea in question was imported was Hyson of a Fine Teenkai, or No. 6 on the list of standards, and that before fixing this standard "the board made diligent search for any Country green teas of lower grades—Hysons of lower grades—of pure teas on the New York market obtainable by the trade, and were unable to find any." The term Hyson, it may be observed, indicated that the tea was made out of the coarsest leaves. For the plaintiff it was testified that the quality of the tea in controversy corresponded in quality with the grade No. 7 on Exhibit 8; while the evidence for the government was to the effect that it would grade as Fair Fychow, No. 11 on Exhibit 8. The testimony also tended to show that the tea in question differed only in respect to the cup quality from the government standard; the evidence for the government being that it was "a tea of a decidedly low grade, . . . a pure tea, but of low quality."

At the close of the evidence the court overruled a motion to direct a verdict for the plaintiff, and an exception was reserved. Thereupon the court, granting a motion on behalf of the defendant, instructed that the only question was as to the constitutionality of the statute under which the defendant, as collector of the port acted, and directed a verdict in his favor. Upon the judgment entered on the verdict, which was returned in accordance with this instruction, the case was brought directly to this court.

*Mr. James L. Bishop,* with whom *Mr. James H. Simpson* was on the brief, for plaintiff in error, in this case and in 294 and 516, which were argued simultaneously therewith :

The act is unconstitutional, because (1) it makes the right to import tea depend upon the arbitrary action of the Secretary of the Treasury and a board appointed by him, and (2) excludes from import wholesome, genuine and unadulterated tea, and (3) discriminates unequally in the admission of the different kinds of teas for import, and in the right to sell and purchase tea. The act confers upon the secretary and the board the uncontrolled power to fix standards of purity, quality, and fitness for consumption, and thus to prescribe arbitrarily what teas may be imported and dealt in.

For cases on this statute, see *Sang Lang* v. *Jackson,* 85 Fed. Rep. 502; *Cruikshank* v. *Bidwell,* 86 Fed. Rep. 7; *S. C.,* 176 U. S. 73; *Buttfield* v. *Bidwell,* 94 Fed. Rep. 126; *S. C.,* 96 Fed. Rep. 328.

The words "fitness for consumption" give the Secretary of the Treasury unlimited power to exclude teas according to his idea of fitness for consumption. An article which one man or class of men might regard as entirely fit for consumption might be regarded by another man or class of men as utterly unfit.

It appears from the history of the legislation that it was the intention of Congress to confer unlimited power upon the Secretary. See act of March 2, 1883, c. 64; act of 1890, c. 339; and see *Buttfield* cases, cited *supra.*

The constitutionality of the statute was not raised in the former proceedings. The application proceeded upon the assumption that the law was constitutional.

The act as heretofore construed excludes all teas from import except such as are equal to standards fixed by the uncontrolled will of the Secretary of the Treasury on the recommendation of the board of appraisers.

The power to regulate commerce with foreign nations and between the States is subject to such limitations as are pre-

scribed by the Constitution and its amendments, among others the Fifth. *Gibbons* v. *Ogden,* 9 Wheat. 196; *Cooley* v. *Port Wardens,* 12 How. 310, 319; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 336; *Councilman* v. *Hitchcock,* 142 U. S. 547; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447; *United States* v. *Joint Traffic Association,* 171 U. S. 503, 505; *Dooley Case,* 188 U. S. 321, 362; *O'Neil* v. *Vermont,* 144 U. S. 323, 371; *United States* v. *Williams,* 2 Hall L. J. 255; *S. C.,* 28 Fed. Cas. 614; 1 Von Holst Const. Law, 204, 211; Story on Const. Law; *Potapsco Guano Co.* v. *North Carolina,* 171 U. S. 345; Cooley Const. Lim. (6th ed.) 720.

As to whether the power to regulate commerce is exclusively with Congress, or whether the several States, in the absence of Congressional legislation, may enact police laws which, in effect, regulate commerce, see *Wilson* v. *The Blackbird Creek Marsh Co.,* 2 Pet. 245; *New York* v. *Miln,* 11 Pet. 182; *The License Cases,* 5 How. 504; *The Passenger Cases,* 7 How. 559. The several States may, in the absence of national legislation, pass police laws upon many subjects which do, in effect, regulate commerce. *Southern Steamship Co.* v. *The Port Wardens,* 6 Wall. 33; *Bowman* v. *Chicago &c. Ry.,* 125 U. S. 489; *N. Y., N. H. & H. R. Co.* v. *State of New York,* 165 U. S. 631; *Reid* v. *Colorado,* 187 U. S. 137.

General police power being exclusively within the control of the States Congress cannot exercise such general police powers under the power to regulate commerce. *Lottery Cases,* 188 U. S. 364, dissenting opinions; *License Cases,* 5 How. 594, 599. It is not within the competency of Congress to prohibit trade between the States in a wholesome article of commerce, or to place such interstate commerce in the arbitrary control of an individual or of a board. J. R. Tucker, 4 Ry. & Corp. L. J. 290.

However extensive the powers of Congress may be over commerce with foreign nations, the laws which it makes for carrying into execution these powers must be "necessary and proper." Const. Art. 1, sec. 8, par. 18; *McCulloch* v.

*Maryland,* 4 Wheat. 421; *Legal Tender Cases,* 12 Wall.
573.

As to extent and definition of the police power the point at
which the demands of government thereunder are restrained
by the paramount constitutional guaranties of liberty and
property cannot be fixed, but must be left to be determined
by the process of exclusion, as applied to particular cases; and
the question whether that limit has been overreached in a
particular instance must always be a judicial question. This
proposition, although now supported by the weight of author-
ity, has not at all times met with approval: *Powell* v. *Penn-
sylvania,* 127 U. S. 678. But see *Marbury* v. *Madison,* 1
Cranch, 137, 176; *Smyth* v. *Ames,* 169 U. S. 468; *Lawton* v.
*Steele,* 152 U. S. 133; *Holden* v. *Hardy,* 169 U. S. 366; *Cotting*
v. *Goddard,* 183 U. S. 83, 86; *Connolly* v. *Union Sewer Pipe Co.,*
184 U. S. 540, 558.

As the Constitution of the United States is the supreme law
of the land, anything in the Constitution or statutes to the con-
trary notwithstanding, a statute of a State even when avowedly
enacted in the exercise of its police power must yield to that
law.

This opinion is confirmed by the latest and best considered
opinions of the state courts. *Noel* v. *The People,* 187 Illinois,
587; *Ritchie* v. *The People,* 155 Illinois, 98; *Ruhstrat* v. *The
People,* 185 Illinois, 133; *Gillespie* v. *The People,* 188 Illinois,
176; *Bessetle* v. *The People,* 193 Illinois, 334; *State* v. *Chicago,*
*M. & St. P. R. Co.,* 68 Minnesota, 381; *In re Jacobs,* 98 N. Y.
98; *People* v. *Marx,* 99 N. Y. 377; *People* v. *Gilson,* 109 N. Y.
389; *Waters* v. *Wolff,* 162 Pa. St. 153; Am. & Eng. Ency. of
Law (2d ed.), vol. 22, p. 937.

Some enlightenment upon this subject may be found from
the history of the tariff rate litigation in this court. *Munn*
v. *Illinois,* 94 U. S. 113; *Railroad Commission Cases,* 116 U. S.
307, 331; *Covington &c.* v. *Sandford,* 164 U. S. 578.

The act violates the Fifth Amendment, because it perma-
nently deprives the plaintiff and other citizens of their right

to trade in a beneficial and wholesome article, except at the uncontrolled will of the Secretary of the Treasury and a board appointed by him.

The right to trade is a natural right. *Mitchell* v. *Reynolds,* 1 P. Williams, 181, 188; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Gundling* v. *Chicago,* 177 U. S. 183, 187; *Crowley* v. *Christenson,* 137 U. S. 86; *Noel* v. *The People,* 187 Illinois, 587; *People* v. *Warden,* 157 N. Y. 116; *Sioux Falls* v. *Kirby,* 25 L. R. A. 621; *Live Stock Dealers* v. *Crescent City Live Stock &c.,* 1 Abb. N. S. 399; *S. C.,* Fed. Cas. No. 8408; *People* v. *Marx,* 99 N. Y. 377.

The right of a citizen to carry on a lawful business cannot be placed under the arbitrary and uncontrolled will of an individual or board. *Cicero Lumber Co.* v. *Cicero,* 176 Illinois, 9; *S. C.,* 42 L. R. A. 696; *Harmon* v. *Ohio,* 66 Ohio St. 249; *S. C.,* 58 L. R. A. 618; *Noel* v. *The People,* 187 Illinois, 587; *Colon* v. *Lisk,* 153 N. Y. 188, 197; *In re Grice,* 79 Fed. Rep. 627; *State* v. *Ashbrook,* 154 Missouri, 375; *N. Y. S. U. Co.* v. *Dept. of Health,* 61 App. Div. N. Y. 106.

This is not inconsistent with anything decided by this court under the Alien Exclusion laws, which rest on the power of Congress to exclude aliens which is incident to every sovereign power. *Lem Moon Sing* v. *United States,* 158 U. S. 538; *Chae Chan Ping* v. *United States,* 130 U. S. 581; *Nishimura Ekiu* v. *United States,* 142 U. S. 651; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Wong Wing* v. *United States,* 163 U. S. 228; *United States* v. *Wong Kim Ark,* 169 U. S. 649; or with the legislation making the decision of immigration or custom officers against the right of aliens to enter the country final. Such laws applied to citizens would be unconstitutional. *United States* v. *Wong Kim Ark,* 169 U. S. 649.

This statute does not fall within the police restrictions and prohibitions upon universal, harmful and dangerous pursuits or with the proper regulations of professions, trades and industries, although innocent and beneficial.

At common-law a man is held to warrant impliedly that he is competent to perform the service which he holds himself out

VOL. CXCII—31

as competent to perform, and if one employing him suffers damages by reason of his want of skill, he is liable therefor. The statutory provisions are intended to safeguard the community against the want of skill which is actionable when resulting in damages.

The rules adopted by any board for the admission of persons to such pursuits must be adapted to and be suitable for the determination of such fitness and skill. Requirements which have no such relation to such calling or profession, or which are unattainable by reasonable study and application, or which are arbitrary, deprive one of his right to pursue a lawful avocation, and statutes permitting such requirements are invalid. *Dent* v. *State of W. Va.*, 129 U. S. 114; *Harmon* v. *Ohio*, 58 L. R. A. 618; *S. C.*, 66 Ohio St. 249; *Noel* v. *The People*, 187 Illinois, 587; *Gundling* v. *Chicago*, 177 U. S. 183; *Minn.* v. *Fleischer*, 41 Minnesota, 69; *City of Monmouth* v. *Popel*, 183 Illinois, 634; *Cumming* v. *Missouri*, 4 Wall. 377; *Ex parte Garland*, 4 Wall. 333.

No such standard can be applied to teas.

The action of such boards as are referred to is open to review by the courts, *Dent* v. *West Virginia*, 129 U. S. 114, 125; *Rietz* v. *Michigan*, 188 N. Y. 505, but the proceedings of the Secretary in fixing the standings are not reviewable by *certiorari*, *People* v. *Gage*, MSS. opinion, nor by bill in equity, *Sang Lung* v. *Jackson; Buttfield* v. *Bidwell, supra*, nor otherwise.

Apart from the arbitrary power lodged with the Secretary, the act is unconstitutional because it prevents the plaintiff and others from dealing in a wholesome and ordinary article of commerce, and destroys a trade in which he and others had been engaged. It has never been decided that under the police power a perfectly harmless trade could be prohibited. *Austin* v. *Tennessee*, 179 U. S. 343, 347; *Lottery Case*, 188 U. S. 321, 362; *Matter of Jacobs*, 98 N. Y. 98; *People* v. *Biesecker*, 169 N. Y. 53; *People* v. *Hawkens*, 157 N. Y. 18; *People* v. *Marx*, 99 N. Y. 379. A presumption of protection of health has sustained some acts. *Powell* v. *Pennsylvania*, 127 U. S. 678.

But see other cases holding oleomargarine statutes unconstitutional. *Schollenber* v. *Pennsylvania,* 171 U. S. 1; *Collins* v. *New Hampshire,* 171 U. S. 30. And as to other matters, *Minnesota* v. *Barber,* 136 U. S. 313; *Brimmer* v. *Rebman,* 138 U. S. 78; *Railroad Co.* v. *Husen,* 95 U. S. 465; *Allgeyer* v. *Louisiana,* 165 U. S. 578.

That the Legislature may not, under guise of police regulation, prohibit trade in wholesome articles is supported by other authorities. *Dorsey* v. *Texas,* 40 L. R. A. 201; *Helena* v. *Dwyer,* 39 L. R. A. 266; *Baltimore* v. *Radecke,* 49 Maryland, 417.

Cases like *Plumley* v. *Massachusetts,* 155 U. S. 461, 476; *People* v. *Arnsberg,* 105 N. Y. 123; *Booth* v. *Illinois,* 184 U. S. 425; *Otis* v. *Parker,* 187 U. S. 606, are not in conflict with this position.

The constitutional validity of a law is to be decided not by what has been done under it, but what may by its authority be done and if the act be construed according to its language as interpreted by the courts below the Secretary and the board have the right to fix a standard which will exclude wholesome tea. *Stuart* v. *Palmer,* 74 N. Y. 183, 188; *Montana Co.* v. *St. Louis, M. & M. Co.,* 152 U. S. 160, 170; *People* v. *Mosher,* 163 N. Y. 32, 42; *Colon* v. *Lisk,* 153 N. Y. 194; *Gilman* v. *Tucker,* 128 N. Y. 190.

The act is unconstitutional because it discriminates unequally in the importation of different kinds of tea and, therefore, denies the plaintiff the equal administration of the laws. It is a sumptuary law and interferes with the right of a man to do what he will do with his own. Cooley Const. Lim. (7th ed.) 549; *People* v. *Budd,* 143 U. S. 517. It is a weapon which may be used to destroy the business of competitors. *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 558; *People* v. *Marx,* 99 N. Y. 380.

This law ought not to be sustained because the establishment of this precedent will open the door to methods of government which experience has shown to be fatal to liberty. *Boyd* v. *United States,* 116 U. S. 635.

The act is unconstitutional because it attempts to delegate to the Secretary of the Treasury and a board named by him legislative powers which can only be exercised by Congress.

The power to regulate commerce cannot be delegated. *Stoutenbergh* v. *Hennick*, 129 U. S. 148; *Robbins* v. *Shelby County*, 120 U. S. 489; *Asher* v. *Texas*, 128 U. S. 129; *Dent* v. *United States*, 71 Pac. Rep. 920; *United States* v. *Blasingame*, 116 Fed. Rep. 654. But see *United States* v. *Dastervignes*, 118 Fed. Rep. 199; *United States* v. *Keokuk Co.*, 45 Fed. Rep. 178; *United States* v. *Rider*, 50 Fed. Rep. 406; *United States* v. *City of Moline*, 82 Fed. Rep. 592; *Harmon* v. *Ohio*, 66 Ohio St. 249; *S. C.*, 58 L. R. A. 618; *Schazlin* v. *Cabaniss*, 67 Pac. Rep. 755; *Dowling* v. *Insurance Co.*, 31 L. R. A. 112; *O'Neil* v. *Insurance Co.*, 166 Pa. St. 71; *Adams* v. *Brudge*, 95 Wisconsin, 390; *Barto* v. *Himrod*, 8 N. Y. 483; *Field* v. *Clark*, 143 U. S. 649; *In re Kollock*, 165 U. S. 526; *United States* v. *Eaton*, 144 U. S. 677; *Kilburn* v. *Thompson*, 103 U. S. 168, 191; *Miller* v. *Mayor*, 109 U. S. 385.

While the legislature may delegate powers not legislative which it may rightfully exercise itself, *Wayman* v. *Southard*, 10 Wheat. 43, it cannot under the guise of conferring discretion confer an authority to make the law.

By this statute all teas are excluded from import. No one has a right to import tea until the Secretary makes a standard. He, therefore, makes the right.

Executive officers are frequently empowered to make regulations to carry into effect duties imposed upon them. These are rules and methods of administration not laws. The act is not confined to establishing a standard of purity only. *Morrell* v. *Jones*, 106 U. S. 466; *United States* v. *Eaton*, 144 U. S. 677; *United States* v. *Three Barrels of Whiskey*, 77 Fed. Rep. 963.

It has been repeatedly held that under the power to make regulations the Executive can neither extend nor contract the law. *Balfour* v. *Sullivan*, 19 Fed. Rep. 578; *Pascal* v. *Sulli-*

*van,* 21 Fed. Rep. 496; *Siegfried* v. *Phelps,* 40 Fed. Rep. 660, and cases above cited.

The cases cited by defendant in error can be distinguished from this case.

The act is unconstitutional in not providing for notice and an opportunity to be heard before the rejection of the tea.

The act itself must provide for the notice, if not specifically it should fix the time and place for the hearing. *The Railroad Tax Cases,* 13 Fed. Rep. 722, 752, 753; *Kuntz* v. *Sumption,* 117 Indiana, 1; *S. C.,* 2 L. R. A. 655; *Reetz* v. *Michigan,* 188 U. S. 505, 509; *Stuart* v. *Palmer,* 74 N. Y. 186. Voluntary notice will not suffice, because what is conferred as a favor to-day may be withheld to-morrow. As to what is due process of law, see *Turpin* v. *Lemon,* 187 U. S. 58; *Hagar* v. *Reclamation District,* 111 U. S. 701; *Simon* v. *Craft,* 182 U. S. 427, 436; *Lent* v. *Tillson,* 140 U. S. 316; *Davidson* v. *New Orleans,* 96 U. S. 97, 107; *Palmer* v. *McMahon,* 133 U. S. 66; *Passavant* v. *United States,* 148 U. S. 214, 222.

This is not a proceeding for the collection of public revenue, in which cases summary remedies may be used which could not be applied in cases of a judicial character. *King* v. *Mullins,* 171 U. S. 429; *Bells Gap R. R. Co.* v. *Pennsylvania,* 134 U. S. 232, 239.

The act is unconstitutional because it authorizes the confiscation of the importer's property without due process of law, as was the fact in the *Stranahan* case.

These teas were not a nuisance. *Yates* v. *Milwaukee,* 10 Wall. 497.

There was no trial as to whether the teas were lawfully rejected and whether the time for their removal had expired. None of these or other questions were concluded by the finding of the board of general appraisers. *Colon* v. *Lisk,* 153 N. Y. 133; *Peck* v. *Anderson,* 57 California, 251; *Dunn* v. *Burleigh,* 62 Maine, 24; *King* v. *Hayes,* 80 Maine, 206; *Lowry*

v. *Rainwater*, 70 Maine, 152; *State* v. *Robbins*, 124 Indiana, 308; *Ridgway* v. *West*, 60 Indiana, 371.

In *Buttfield* v. *Bidwell* (No. 296), the evidence establishes a case of personal liability against the defendant.

The teas having been entered for import at the custom-house, were in the control of the collector. *Conrad* v. *Pacific Ins. Co.*, 6 Pet. 262, 281; *Tracy* v. *Swartwout*, 10 Pet. 80.

It is not sought to hold the collector liable for the negligence, misconduct or other wrongful act of a subordinate official, but for duress of goods under a duty imposed upon him by an unconstitutional law. *United States* v. *Lee*, 106 U. S. 196; *Stanley* v. *Schwartz*, 147 U. S. 508, 518.

Officials acting under unconstitutional statutes which are ineffectual to protect them, are liable for damages sustained by their wrongful act or where officials have been restrained from proceeding to enforce such unconstitutional law. *Osborn* v. *Bank*, 9 Wheat. 738; *Poindexter* v. *Greenhow*, 114 U. S. 270; *Pennoyer* v. *McConaughy*, 140 U. S. 1; *Smith* v. *Ames*, 169 U. S. 466; *Scott* v. *Donald*, 165 U. S. 56; *Tendal* v. *Wesley*, 167 U. S. 204. The same thing is true whenever an official, exceeding his lawful powers, inflicts an injury under color of office. *Siegfried* v. *Phelps*, 40 Fed. Rep. 660; *Leslin* v. *Hedden*, 28 Fed. Rep. 416; *Pascal* v. *Sullivan*, 21 Fed. Rep. 496.

The rule that an officer is not liable for the tortious acts of his subordinate has no application where the act performed is a duty imposed by a law. *Cleveland &c. Ry. Co.* v. *McClung*, 119 U. S. 454; *Belknap* v. *Achild*, 161 U. S. 10, 18; *Iselin* v. *Hedden*, 28 Fed. Rep. 416; *Head* v. *Porter*, 48 Fed. Rep. 482.

Where a public officer has established a regulation in the course of business that he will not do a certain act except upon certain terms which are illegal, or that he will not accept payment except upon conditions that he has no right to impose, a tender and demand are waived. *United States* v. *Lee*, 106 U. S. 196; *Swift* v. *United States*, 101 U. S. 22.

In the *Seven Package* case the plaintiff in error is not estopped by giving a bond under duress, from questioning the

constitutionality of the act. If the act was unconstitutional the bond was plainly void as being without consideration, and extorted by duress, and the giving of the bond under such circumstances would not operate as an estoppel. *O'Brien* v. *Wheelock,* 184 U. S. 450; *Coburn* v. *Townsend,* 103 California, 233; Am. & Eng. Ency. of Law (2d ed.), vol. 4, p. 667.

If the act is unconstitutional for any of the reasons argued it is wholly void because it is impossible to sever the invalid provisions from the valid provisions, if there be any. *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S. 636; *Spraigue* v. *Thompson,* 118 U. S. 93, 95; *Trade Mark Cases,* 100 U. S. 98.

*Mr. Edward B. Whitney,* special assistant to the Attorney General, with whom *Mr. Solicitor General Hoyt* was on the brief, for defendant in error:

This is the last of a series of cases which have been brought in different forms for the purpose of testing the constitutionality of the tea-inspection act of March 2, 1897, 29 Stat. 604. *Sang Lung* v. *Jackson,* 85 Fed. Rep. 502; *Cruickshank* v. *Bidwell,* 86 Fed. Rep. 7; 176 U. S. 73; *Buttfield* v. *Bidwell,* 94 Fed. Rep. 126; 96 Fed. Rep. 328; *United States ex rel. Hamilton* v. *Gage,* Sup. Ct. Dist. Col. 1901; *Buttfield* v. *Bidwell,* No. 296 of this term.

The Treasury regulations which were in effect at the time of the importation of these teas are matter of which this court may take judicial notice. *Caha* v. *United States,* 152 U. S. 211; *Cosmos Co.* v. *Eagle Co.,* 190 U. S. 301, 309.

In construing an act not only is prior legislation *in pari materia* to be considered, but also it is important to examine the original form of the bill and the way in which the amendments thereto were inserted, for which purpose the journals of Congress may be considered, *Blake* v. *National Banks,* 23 Wall. 307; *Legal Tender Cases,* 12 Wall. 559; *United States* v. *Burr,* 159 U. S. 85; *Chesapeake Co.* v. *Manning,* 186 U. S. 238, 245, and, while it is not permitted to examine the debates of Congress, it is proper to examine the reports of Congressional

committees, upon which reports the action of Congress was based. *The Delaware,* 161 U. S. 459, 472.

The former act *in pari materia* was the act of March 2, 1883, c. 64, 22 Stat. 451.

Every intendment is in support of the constitutionality of the act. *Gettysburg Park Case,* 160 U. S. 668, 680; *Pine Grove* v. *Talcott,* 19 Wall. 666, 673; *Nicol* v. *Ames,* 173 U. S. 509, 514, 515; *Commonwealth* v. *Blackington,* 24 Pick. 353, 355.

The power to regulate commerce with foreign nations includes the power to prohibit the importation of these low-grade teas. *United States* v. *Brigantine Williams,* 2 Hall's L. J. 255; 28 Fed. Cas. 614; 2 Story on Const. §§ 1093, 1290, 1292; 1 Kent, 431; 9 Stat. 237; Rev. Stat. § 2933; *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188, 194; *Lottery Case,* 188 U. S. 321, 354, 374; *United States* v. *Realty Co.,* 163 U. S. 427; *Murray's Lessee* v. *Hoboken Land & Imp. Co.,* 18 How. 272. As to governmental limitations on foreign commerce, see licenses granted to individuals showing powers of government. Leone Levi, History of British Commerce (2d ed.), pp. 30, 109, 235, 236; Adam Smith, Wealth of Nations, Book IV, c. I; New York Statutes of March 15, 1781, c. 29; 9 Hening's Virginia Statutes, 1778, p. 532; 2 Stat. 500, 506.

The power to regulate commerce with foreign nations, being an enumerated power, is entirely unlimited so long as it does not violate any of the specific constitutional restrictions upon legislative authority. *Lottery Case,* 188 U. S. 321, 353, 356. An enumerated power is "distinct and independent, to be exercised in any case whatever." *McCulloch* v. *Maryland,* 4 Wheat. at p. 421; *Doyle* v. *Continental Insurance Co.,* 94 U. S. 535 541. It acknowledges no limitations other than those prescribed in the Constitution. *Leisy* v. *Hardin,* 135 U. S. 100, 108. It may be used for any lawful purpose. *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Hauenstein* v. *Lynham,* 100 U. S. 483, and cases cited; *Geofroy* v. *Riggs,* 133 U. S. 258, 266, 267; *Patapsco Guano Co.* v. *North Carolina,* 171 U. S. 345.

The intent of the statute is, and for proper reason, to exclude

teas of inferior quality though sufficiently pure and not unwholesome, so decided in *Buttfield* v. *Bidwell*, 96 Fed. Rep. 328. The word "quality" must not be regarded as surplusage and the construction of the statute left to depend on the words "fitness for consumption" construed as "wholesome." As to significance of every word in a statute, see Bacon's Abridgment, § 2; *Market Co.* v. *Hoffman*, 101 U. S. 112, 115. The act is remedial and is to be construed as such. *United States* v. *Stowell*, 133 U. S. 1. The fact that the title is narrower than the scope of the act is immaterial.

The title may be used in construing a statute when the body of the statute is ambiguous; but the ambiguity must be found in the word to be construed or in its context, and not in the title. *Patterson* v. *Bark Eudora*, 190 U. S. 169, and cases cited; *Hadden* v. *The Collector*, 5 Wall. 107, 110.

For incongruities between titles and matter of acts of Congress, sponges used to appear under the heading of "Chemicals, oils, or paints," and cork under "Flax, hemp, and jute." See 21 Atty. Gen. Opin. 67; *Hollender* v. *Magone*, 149 U. S. 586, 591; *Seeberger* v. *Schlesinger*, 152 U. S. 581, 583.

The statute being based upon an unlimited power of Congress, it is unnecessary to argue in its justification.

The delegation of details to the Secretary of the Treasury was proper, and indeed absolutely necessary. There is nothing new about the establishment of physical standards. The Treasury Department at an early day had established standards of weight and measure. 5 Stat. 133, and for other instances, see 14 Stat. 560; Rev. Stat. § 2916; 13 Stat. 202; Rev. Stat. § 2914; *Merritt* v. *Welsh*, 104 U S. 694, 702.

The line between the province of the legislature and that of the executive is difficult to determine, *Wayman* v. *Southard*, 10 Wheat. 1, 46; *In re Oliver*, 17 Wisconsin, 681, and the statute is to be given the benefit of any doubt. Carrying into affect in detail the legislative will is generally left to executive officers, although the details may be settled by the legislature if it desires to do so.

For other statutes of this nature sustained, see *Field* v. *Clark*, 143 U. S. 649, 680; *Dunlap* v. *United States*, 173 U. S. 65.

The lower courts held that the discretion lodged in the Secretary of War as to allowing bridges over navigable rivers is an unconstitutional delegation of power, but the latest decisions are to the contrary. *United States* v. *City of Moline*, 82 Fed. Rep. 592; *E. A. Chatfield Co.* v. *New Haven*, 110 Fed. Rep. 788. The question has not been passed upon in this court. *Montgomery* v. *Portland*, 190 U. S. 89, 106, 107. The Secretary of War has a general right to make rules for the regulation of navigation on navigable rivers, which have the force of law; and both he and the Secretary of the Navy have large legislative powers over their respective departments of the public defence. *United States* v. *Ormsbee*, 74 Fed. Rep. 207, 209, and cases cited. As to power of Secretary of Interior, see *Dastervignes* v. *United States*, 122 Fed. Rep. 30. See also 30 Stat. 35; 1 Stat. 372; 1 Stat. 615; 2 Stat. 9; 2 Stat. 352, 411; 3 Stat. 224; 24 Stat. 475; Rev. Stat. § 2494; 26 Stat. 414; *Jones* v. *United States*, 137 U. S. 202. As to Guano Acts, 11 Stat. 119; Porto Rico Act, 31 Stat. 78; Philippine Act, 31 Stat. 910; 1 Dillon Munic. Corp. § 308; *Paul* v. *Gloucester County*, 50 N. J. Law, 585, 600; *In re Grimer*, 16 Wisconsin, 423; Customs Regulation, 1892, p. 370; *Isenhour* v. *State*, 157 Indiana, 517, 522; 32 Stat. 1147, 1158; Tariff Act of 1897, par. 473; Alaska Act, 15 Stat. 240; Rev. Stat. § 1955; 17 Stat. 429; Rev. Stat. § 3529; *United States* v. *Bailey*, 9 Pet. 238; *Caha* v. *United States*, 152 U. S. 211, 219; *Hanover Bank* v. *Moyses*, 186 U. S. 181, 189; *Hewitt* v. *Charier*, 16 Pick. 353; *State* v. *Heinemann*, 80 Wisconsin, 253; *Dent* v. *West Virginia*, 129 U. S. 114, 122; *Reetz* v. *Michigan*, 188 U. S. 505; *Overshiner* v. *State*, 156 Indiana, 187, 193; *Scholle* v. *State*, 90 Maryland, 729; *Martin* v. *Witherspoon*, 125 Massachusetts, 175; *Brodbine* v. *Revere*, 182 Massachusetts, 598; *In re Flaherty*, 105 California, 558; *Wilson* v. *Eureka City*, 173 U. S. 32, 36, 37.

As to delegation of pardoning power, 6 Stat. 3; *The Laura*, 114 U. S. 411. As to patents, *United States* v. *Duell*, 172 U. S. 576.

Due process of law was not denied to the plaintiff. *Origel* v. *Hedden*, 155 U. S. 228, 236; *Auffmordt* v. *Hedden*, 137 U. S. 310, 323. The finding was final and the importer's only remedy was by appeal to the dispensing power of the Secretary of the Treasury. *Passavant* v. *United States*, 148 U. S. 214; *Origet* v. *Hedden, supra*, at p. 236. This "additional duty" was a penalty in the strictest sense of the word. 4 Op. 182; 20 Op. 660.

A person who imports nonimportable goods may properly be put to the expense of taking them away again. The case is similar to that of the return of an alien immigrant at the expense of the transportation company that has brought him into our ports. Acts of Sept. 13, 1888, c. 1015; March 3, 1891, c. 551. Under these statutes the inspectors are not required to take any testimony; their decision is absolutely final. *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 663; *Lem Moon Sing* v. *United States*, 158 U. S. 538; *Chin Bak Kan* v. *United States*, 186 U. S. 192.

Plaintiff was not damnified by the act of 1897 or by the standard of 1901. Either his loss is due to his own failure to notify his buyers in China; or it is due to their default, for which he is responsible as against others and they are responsible to him; or it is due to a plan of his own to import teas below the standard, procure a judgment establishing the unconstitutionality of the act, and thus undersell his competitors.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

The assignments of error assail the act of the trial court in denying the motion for the direction of a verdict in favor of plaintiff and in giving a peremptory instruction in favor of the defendant. Summarized, the contentions are as follows: 1, that the act of March 2, 1897, confers authority to establish standards, and that such power is legislative and cannot constitutionally be delegated by Congress to administrative officers; 2, that the plaintiff in error had a vested

right to engage as a trader in foreign commerce and as such to import teas into the United States, which as a matter of fact were pure, wholesome and free from adulteration, fraud and deception, and which were fit for consumption; 3, that the establishment and enforcement of standards of quality of teas, which operated to deprive the alleged vested right, constituted a deprivation of property without due process of law; 4, that the act is unconstitutional, because it does not provide that notice and an opportunity to be heard be afforded an importer before the rejection of his tea by the tea examiner, or the Tea Board of General Appraisers; and, 5, that in any event the authority conferred by the statute to destroy goods upon the expiration of the time limit for their removal for export and the destruction of such property, without a judicial proceeding, was condemnation of property without hearing and the taking thereof without due process of law.

Whether the contentions just stated are tenable are the questions for consideration.

In examining the statute in order to determine its constitutionality we must be guided by the well-settled rule that every intendment is in favor of its validity. It must be presumed to be constitutional, unless its repugnancy to the Constitution clearly appears. *Nicol* v. *Ames*, 173 U. S. 509, 514, 515; *Gettysburg Park Case*, 160 U. S. 668, 680.

The power to regulate commerce with foreign nations is expressly conferred upon Congress, and being an enumerated power is complete in itself, acknowledging no limitations other than those prescribed in the Constitution. *Lottery Case*, 188 U. S. 321, 353–356; *Leisy* v. *Hardin*, 135 U. S. 100, 108. Whatever difference of opinion, if any, may have existed or does exist concerning the limitations of the power, resulting from other provisions of the Constitution, so far as interstate commerce is concerned, it is not to be doubted that from the beginning Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries; not alone directly by the enactment of embargo statutes, but

indirectly as a necessary · result of provisions contained in tariff legislation. It has also, in other than tariff legislation, exerted a police power over foreign commerce by provisions which in and of themselves amounted to the assertion of the right to exclude merchandise at discretion. This is illustrated by statutory provisions which have been in force for more than fifty years, regulating the degree of strength of drugs, medicines and chemicals entitled to admission into the United States and excluding such as did not equal the standards adopted. 9 Stat. 237; Rev. Stat. sec. 2933 *et seq.*

The power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes. And this last power was referred to in *United States* v. *43 Gallons of Whiskey*, 93 U. S. 188, 194, as exclusive and absolute, and was declared to be "as broad and as free from restrictions as that to regulate commerce with foreign nations." In that case it was held that it was competent for Congress to extend the prohibition against the unlicensed introduction and sale of spirituous liquors in the Indian country to territory in proximity to that occupied by the Indians, thus restricting commerce with them. We entertain no doubt that it was competent for Congress, by statute, under the power to regulate foreign commerce, to establish standards and provide that no right should exist to import teas from foreign countries into the United States, unless such teas should be equal to the standards.

As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations, which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution.

That the act of March 2, 1897, was not an exercise by Congress of purely arbitrary power is evident from the terms of the law, and a consideration of the circumstances which led to its enactment. The history of the act and its proper construction, as also the reasons for deciding that the regulations of the Secretary of the Treasury establishing the standard here in question were warranted by the statute, were succinctly stated in the opinion of the Court of Appeals for the Second Circuit in *Buttfield* v. *Bidwell*, 96 Fed. Rep. 328, and we adopt such statement. The court said:

"The basic question in this case is as to the true construction of the act of Congress of March 2, 1897, entitled 'An act to prevent the importation of impure and unwholesome tea.' Section 1 makes it unlawful 'to import or bring into the United States any merchandise as tea which is inferior in purity, quality, and fitness for consumption to the standards provided in section 3 of this act, and the importation of all such merchandise is hereby prohibited.' Section 2 provides for the appointment by the Secretary of the Treasury, immediately after the passage of the act, and on or before February 15 of each subsequent year, of the board of tea experts, 'who shall prepare and submit to him standard samples of tea.' Section 3 provides that the Secretary of the Treasury, upon the recommendation of said board, 'shall fix and establish uniform standards of purity, quality and fitness for consumption of all kinds of teas imported into the United States,' samples of such standards to be deposited in various custom-houses, and supplied to importers and dealers at cost, and declares that " all teas, or merchandise described as tea, of inferior purity, quality and fitness for consumption to such standards shall be deemed to be within the prohibition of the first section hereof." Sections 4–7 provide for the examination of importations of tea, for a reëxamination by the board of general appraisers in case of a protest by the importer or collector against the finding of the primary examiner, and for testing the purity, quality and fitness for consumption in all cases of examination or reëxamination, 'ac-

cording to the usages and customs of the tea trade, including the test of an infusion of the same in boiling water, and, if necessary, chemical analysis.' . . . . The history of the enactment shows that the word ('quality') was industriously inserted to make the act a more stringent substitute for the existing legislation. By the act of March 3, 1883, then in force, any merchandise imported 'for sale as tea,' adulterated with spurious or exhausted leaves, or containing such an admixture of deleterious substances as to make it 'unfit for use,' was prohibited; and exhausted leaves were defined to include any tea which had been deprived of its proper quality, strength, or virtue by steeping, infusion, decoction, or other means. Thus the importation of tea containing such an admixture of leaves as to be deprived of its proper quality or virtue by any method of treatment was prohibited. The act, however, contained no provision for the establishment of government standards; and the establishment of uniform standards in the interest of the importer and of the consumer had become a recognized necessity. In a report by the Senate Committee on Commerce, in 1897, the provision was suggested as designed, among other things, to protect the consumer against 'worthless rubbish,' and insure his 'receiving an article fit for use.' The report pointed out that the 'lowest average grade of tea ever before known was now being used' by our consumers, and proposed as a remedy the establishment of standards of the 'lowest grades of tea fit for use.' As originally introduced in the House, the bill prohibited the importation of 'any merchandise as tea which is inferior in purity or fitness for consumption to the standards provided in section 3 of this act.' It was amended in the Senate by inserting the word 'quality' between the words 'purity' and 'fitness for consumption' wherever they occurred in the House bill. The amendment evinces the intention of the Senate to authorize the adoption of uniform standards by the Secretary of the Treasury which would be adequate to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or

presumably or possibly so because of their inferior quality. The House concurred in the amendment, and the measure was enacted in its present terms. We conclude that the regulations of the Secretary of the Treasury are warranted by the provisions of the act."

The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported, and therefore in effect vests that official with legislative power, is without merit. We are of opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. The case is within the principle of *Field* v. *Clark*, 143 U. S. 649, where it was decided that the third section of the tariff act of October 1, 1890, was not repugnant to the Constitution as conferring legislative and treaty-making power on the President, because it authorized him to suspend the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea and hides. We may say of the legislation in this case, as was said of the legislation considered in *Field* v. *Clark*, that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted.

Whether or not the Secretary of the Treasury failed to carry into effect the expressed purpose of Congress and established

standards which operated to exclude teas which would have been entitled to admission had proper standards been adopted, is a question we are not called upon to consider. The sufficiency of the standards adopted by the Secretary of the Treasury was committed to his judgment, to be honestly exercised, and if that were important there is no assertion here of bad faith or malice on the part of that officer in fixing the standards, or on the part of the defendant in the performance of the duties resting on him.

It is urged that there was denial of due process of law in failing to accord plaintiff in error a hearing before the Board of Tea Inspectors and the Secretary of the Treasury in establishing the standard in question, and before the general appraisers upon the reëxamination of the tea. Waiving the point that the plaintiff in error does not appear to have asked for a hearing; and assuming that the statute did not confer such a right, we are of opinion that the statute was not objectionable for that reason. The provisions in respect to the fixing of standards and the examination of samples by government experts was for the purpose of determining whether the conditions existed which conferred the right to import, and they therefore in no just sense concerned a taking of property. This latter question was intended by Congress to be finally settled, not by a judicial proceeding, but by the action of the agents of the government, upon whom power on the subject was conferred.

It remains only to consider the contention that the provision of the statute commanding the destruction of teas not exported within six months after their final rejection was unconstitutional. The importer was charged with notice of the provisions of the law, and the conditions upon which teas might be brought from abroad, with a view to their introduction into the United States for consumption. Failing to establish the right to import, because of the inferior quality of the merchandise as compared with the standard, the duty was imposed upon the importer to perform certain requirements, and to take the goods from the custody of the authorities within a period

of time fixed by the statute, which was ample in duration. He was notified of the happening of the various contingencies requiring positive action on his part. The duty to take such action was enjoined upon him, and if he failed to exercise it the collector was under the obligation after the expiration of the time limit to destroy the goods. That plaintiff in error had knowledge of the various steps taken with respect to the tea, including the final rejection by the board of general appraisers, is conceded. We think the provision of the statute complained of was not wanting in due process of law.

*Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE BROWN, not having heard the argument, took no part in the decision of this case.