## UNITED STATES v. TWENTY CHESTS OF TEA.

(District Court, N. D. New York. October 6, 1913.)

FOOD (§ 12*)—IMPORTATION OF IMPURE TEA—REIMPORTATION OF REJECTED TEA —FORFEITURE.

Under Act March 2, 1897, c. 358, § 9, 29 Stat. 606 (U. S. Comp. St. 1901, p. 3197), being "an act to prevent the importation of impure and unwholesome tea," which section provides that "no imported teas which have been rejected and exported under the provisions of this act shall be reimported into the United States under the penalty of forfeiture for a violation of this prohibition," any person offering tea for import is bound to know whether or not it has previously been offered and rejected, and if it has he cannot be relieved from the penalty of forfeiture because he did not in fact know but offered it in good faith.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 12.*]

Libel by the United States for forfeiture of Twenty Chests of Tea. Judgment of forfeiture.

Libel for forfeiture of 20 chests of tea rejected by customs examiner and released and exported under the provisions of the act entitled "An act to prevent the importation of impure and unwholesome tea," approved March 2, 1897, and reimported into the United States in alleged violation of section 9 of the said act.

John H. Gleason, U. S. Atty., of Albany, N. Y., and Thos. H. Dowd, Asst. U. S. Atty., of Cortland, N. Y.

Weeds, Conway & Cotter, of Plattsburg, N. Y., for claimants.

RAY, District Judge. On the 5th day of March, 1912, Theodore Crowell imported into the United States at the port of New York by the steamer Afghan Prince, 70 half chests of tea, marked F. M. March 5, 1912, on examination pursuant to the provisions of the act, said tea was found to be inferior in purity, quality, and fitness for consumption and was duly rejected. On appeal this determination was approved and affirmed.

On or about May 18, 1912, said tea was entered at the port of New York for exportation in bond to Montreal, Canada, and examined and delivered for exportation at the border port of Malone, N. Y., on the 24th day of May, 1912. Same was entered at the Canadian Custom House in Montreal, entry No. 17,287, June 13, 1912, by W. P. Lumley, custom house broker, for Alex Hendrey, agent for the Anglo-American Direct Tea Trading Company of Toronto, Canada. Said company sold said tea to Joseph Ward & Co. of Montreal, P. Q. Said Joseph Ward & Co. sold 28 half chests of said tea to John Moir of Montreal, P. Q. Said John Moir sold 20 of said 28 half chests of such tea to Kearney Bros., Limited, of Montreal, P. Q. On or about the 27th day of September, 1912, said Kearney Bros., Limited, entered said 20 packages of said tea so purchased by it from John Moir at the subport of Rouses Point, N. Y., in the customs district of Champlain, for importation into the United States, and such tea was seized by the duly constituted and authorized officers and authorities of the United States.

* For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

When Joseph Ward & Co. purchased said 20 half chests of tea from the said Anglo-American Direct Tea Trading Company, it had no knowledge or notice that the same had been imported into the United States, examined, found inferior, etc., and exported in bond to Canada as aforesaid; and, when John Moir purchased same of Joseph Ward & Co., he had no notice or knowledge that said tea had been examined, found inferior, etc., and exported from the United States to Canada as aforesaid; and, when Kearney Bros., Limited, purchased said 20 half chests of said tea from John Moir which he had so purchased from said Joseph Ward & Co., it had no knowledge or notice of said attempted importation of such tea into the United States, examination, finding of inferiority, etc., rejection, and exportation to Canada as aforesaid. When Kearney Bros., Limited, so purchased said tea of Moir, they purchased it for importation into the United States and at the time so stated to said John Moir and were then told by said Moir and believed that such tea was entitled to import into the United States and complied with the standards of purity, quality, and fitness required by the laws of the United States, and at no time did Kearney Bros., Limited, or any one acting for it, up to the time the said tea was seized by the government of the United States after it reached the subport of Rouses Point for importation into the United States, have any knowledge or information that such tea had once been offered for importation into the United States, examined, found inferior, etc., rejected, and exported to Canada in bond as aforesaid.

The Anglo-American Direct Tea Trading Company of Toronto, Canada, who received said tea after examination and rejection at the port of New York, must have known of such inferiority, examination, and rejection, and Joseph Ward & Co., on inquiry, could have ascertained the facts, and John Moir on inquiry could have ascertained the facts. Moir when he sold the tea to Kearney Bros., Limited, made representations which he did not know to be true and he had not, so far as appears, made any inquiry to ascertain the truth of such representations.

Section 9 of the said act entitled "An act to prevent the importation of impure and unwholesome tea" provides:

"That no imported teas which have been rejected by a customs examiner or by a board of United States general appraisers, and exported under the provisions of this act, shall be reimported into the United States under the penalty of forfeiture for a violation of this prohibition."

Section 10 of the act provides:

"That the Secretary of the Treasury shall have the power to enforce the provisions of this act by appropriate regulations."

Should and may this tea in question be forfeited under the provisions of section 9, above quoted, in the absence of evidence that the importer, Kearney Bros., Limited, had knowledge that such tea had once been offered for importation, examined, found impure, etc., and therefore exported to Canada? It is contended that such a forfeiture, under such circumstances, and in the absence of such evidence,

would amount to a confiscation of the property, or, as counsel for the owners of the tea put it:

"Therefore the question comes up squarely, can or should an innocent person be deprived of his goods because the prior owner, unknown to him, has so acted with these goods that if the present owner exercises his right to offer them for import into the United States he should forfeit them and lose his property because of the act of the prior owner?"

The claimant or owner also urges that the government of the United States "could easily have so branded or stamped the packages showing that it had once been rejected by the customs authorities and thus give notice to the world and all subsequent innocent purchasers, who could then protect themselves."

The standard of purity, etc., for tea is fixed by regulation of the Treasury Department, and all persons offering tea for importation into the United States are bound at their peril to conform to that standard. There is no law, rule, or regulation requiring the examiners or officers of the United States government to brand or mark the packages of tea rejected by them. It was easy for the owner who offered it for import in the first instance to mark it after rejection or have it marked. It was the duty of Kearney Bros., Limited, to make inquiry as to the origin of the tea and as to its quality, etc., before offering it for importation into the United States. Due inquiry would have traced it back to the original importer. The stipulated facts fail to disclose that any inquiry was made as to the history of this tea, who brought it from the country where produced. Articles of merchandise for human consumption are not presumed to be up to the standard of purity fixed by the laws of the United States, and the rules and regulations of the Treasury Department and every person who deals in teas outside the limits of the United States and offers them for importation into the United States does so at his peril, and so far as our laws are concerned is presumed and bound to know that they are subject to seizure and condemnation if offered in violation of law.

When this tea was examined and rejected and sent out of the country, the owner and all who purchased from such owner thereafter were bound at their peril to know the status of such tea, and subsequent purchasers were bound to ascertain and know that such tea had been offered for importation, examined, rejected, and sent out of the United States, and was subject to seizure and forfeiture if offered for reimportation into the United States.

The act in question has been the subject of judicial inquiry and decision and held constitutional by the Supreme Court of the United States. Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525. In that case the point was urged, the destruction of the tea having been ordered, that:

"There was a denial of due process of law in failing to accord plaintiff in error a hearing before the Board of Tea Inspectors and the Secretary of the Treasury in establishing the standard in question, and before the general appraisers upon the re-examination of the tea."

The court said:

"Waiving the point that the plaintiff in error does not appear to have asked for a hearing, and assuming that the statute did not confer such a right, we are of opinion that the statute was not objectionable for that reason."

· The court then said on the question of the provision for the destruction of the tea:

"It remains only to consider the contention that the provision of the statute commanding the destruction of teas not exported within six months after their final rejection was unconstitutional. The importer *was charged with notice of the provisions of the law, and the conditions upon which teas might be brought from abroad*, with a view of their introduction into the United States for consumption. Failing to establish the right to import, because of the inferior quality of the merchandise as compared with the standard, the duty was imposed upon the importer to perform certain requirements, and to take the goods from the custody of the authorities within a period of time fixed by the statute, which was ample in duration. He was notified of the happening of the various contingencies requiring positive action on his part. The duty to take such action was enjoined upon him, and if he failed to exercise it the collector was under the obligation after the expiration of the time limit to destroy the goods. That plaintiff in error had knowledge of the various steps taken with respect to the tea, including the final rejection by the board of general appraisers, is conceded. We think the provision of the statute complained of was not wanting in due process of law."

Buttfield v. United States, 192 U. S. 499, 24 Sup. Ct. 356, 48 L. Ed. 537, was a proceeding, like this, for the condemnation of seven packages of tea which had been reimported after export from this country upon a final rejection of the tea by the board of general appraisers as not entitled to admission into the United States for consumption under the provisions of the act in question. Buttfield appeared as claimant and filed a demurrer to the information. This was overruled and a final decree and judgment of forfeiture was pronounced. An appeal was taken on the ground that the act was repugnant to the Constitution of the United States. The contention was overruled and the judgment of forfeiture affirmed.

From the report of that case it does not appear that the question of a purchase in good faith for value by the one seeking to reimport the tea was involved. But I am not able to see that this is at all important. As stated, it seems to me that the status of this tea as to importation or attempted importation into the United States by any one had been fixed, and that *it* was subject to the penalty of seizure and forfeiture in whose hands soever it might be. The remedy of the government in such case is drastic, and the penalty is severe; but the act is constitutional, and the only question is: Does section 9 subject tea once rejected and sent out of the country to forfeiture if offered for reimportation by any one, one ignorant of the facts? Must the government re-examine tea offered in fact for reimportation whenever the importer offers it and alleges that he had no knowledge of its previous history, that is, its examination, rejection, etc., or go to the trouble and expense of hunting up evidence to show that the one offering it for importation had knowledge of such facts?

The government has the right and power to enact and enforce the

most arbitrary laws as to the importation of goods from foreign countries. He who offers them subjects himself and his goods offered for importation to the operation of those laws. This court does not intend to hold that in exercising this power the United States may seize and forfeit goods offered for importation for the reason such goods are not up to the standard prescribed, but when once offered, examined, condemned as impure, and rejected and sent out of the United States, it seems to me clear that Congress intended that a subsequent offer of the same goods *by any person* for importation subjects such goods to forfeiture.

In The Abby Dodge, 223 U. S. 166, 32 Sup. Ct. 310, 56 L. Ed. 390 (citing Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525) the court held:

"The power of Congress over foreign commerce is complete; no one has a vested right to carry on foreign commerce with the United States. * * *. When Congress, under its power to regulate foreign commerce, prohibits the importation of certain merchandise, it may cast on the one seeking to bring merchandise in the burden of establishing that it is exempt from the operation of the statute."

In this case it seems to the court the importer is charged with knowledge of the law and knowledge that if the teas offered had once been offered, examined, rejected, and sent out of the United States, that same were subject to forfeiture if again offered. He took his chances and was bound to ascertain and know that such teas were within the condemnation of section 9 of the tea act. If in such cases the only remedy of the United States on identifying teas offered for importation as having before been offered for importation, examined, found impure, etc., and sent out of the country, is to turn them back, refuse importation, they may be offered again and again at the same or different ports of entry. The purpose of the tea act is to keep out of this country impure and unwholesome teas. It is in the nature of a police regulation. The standard of teas prescribed by the United States is easily ascertained, and this importer, had he caused the tea to be examined and tested before offering it for importation into the United States, would have known it was not up to the standard, and, as stated, I do not think he was justified in relying on the statements of Moir that the teas were of a character and quality suitable for importation into the United States. Kearney Bros., Limited, should have ascertained the source of John Moir's title and that of his vendor, and, had they pursued their investigations, presumably it would have been disclosed to them that these teas had been sent out of the United States as unfit for importation into this country. On the whole, I do not see that any injustice is done importers by casting on them the responsibility of knowing whether or not teas offered by them for importation into the United States are subject and liable to forfeiture under the laws of the United States. Under the facts stipulated it is apparent that Kearney Bros., Limited, had no intent or purpose to defraud the United States; but there is nothing in the tea act that makes such intent a prerequisite to forfeiture, and hence the absence of such intent is immaterial in this and similar cases.

In St. Louis, Iron Mountain Ry. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061, the court held:

"The courts have no responsibility for the justice or wisdom of legislation. They must enforce the statute, unless clearly unconstitutional, as it is written, and, when Congress has prescribed by statute a duty upon a carrier, the courts cannot avoid a true construction thereof simply because such construction is a harsh one."

In this statute we find no words of limitation confining the forfeiture to one who imports the teas with knowledge that they had once been rejected and sent out of the country, and I think the courts are powerless to import such words into the statute.

I have examined the numerous cases cited by the claimants, but find nothing that requires or permits a different holding in giving construction of this tea act.

There will be a judgment of forfeiture.