### NASH v. SOUTHERN PAC. CO.

(District Court, N. D. California, N. D.    August 13, 1919.)

#### No. 51.

1. RAILROADS ☞5½, New, vol. 6A Key-No. Series—FEDERAL CONTROL—AUTHORITY OF PRESIDENT—ACTION AGAINST CARRIER.

General Order No. 50 of the Director General of Railroads, in requiring all actions and suits on claims for death or injury to person, or loss or damage to property, growing out of the possession, use, control, or operation of any railroad by the Director General of Railroads, which might but for federal control have been brought against the carrier company, to be brought against the Director General, is within the authority lawfully conferred on the President by Federal Control Act March 21, 1918 (Comp. St. 1918, §§ 3115¾a–3115¾p), and is not inconsistent with section 10 of said act.

2. RAILROADS ☞5½, New, vol. 6A Key-No. Series—ACTIONS AGAINST—PARTIES—OPERATION UNDER FEDERAL CONTROL.

Under General Order No. 50 of the Director General of Railroads, in an action against a railroad company for an injury alleged to have been caused by negligent operation while the road was under federal control, the Director General will, on his motion, be substituted as defendant, and the company be dismissed therefrom.

At Law.    Action by George H. Nash against Southern Pacific Company.    On motion for substitution of defendants.    Granted.

W. T. Belieu, of Willows, Cal., for plaintiff.
Devlin & Devlin, of Sacramento, Cal., for defendant.

VAN FLEET, District Judge.    The question presented is one of proper parties, arising from the taking over by the government of the control and operation of the railroads and their connected systems of transportation as a war measure, and its solution is to be found in

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the construction and effect to be given the legislation by Congress to that end and the powers granted to and exercised by the President thereunder. After the resolutions by Congress declaring a state of war to exist between the United States and the two Central Empires respectively—which need not be recited—Congress, in the "Act making appropriations for the support of the army for the fiscal year ending June 30, 1917," approved August 29, 1916 (39 Stat. 645, c. 418 [Comp. St. 1918, § 1974a]) declared (section 1):

"The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

Thereafter, on December 26, 1917, the President issued his proclamation wherein, referring to such resolutions, and the act of Congress aforesaid, and the necessity for the exercise by him of the powers thereby conferred, it is, among other provisions not here material, declared:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Newton D. Baker, Secretary of War, take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads, and owned or controlled systems of coastwise and inland transportation, * * * and all other equipment and appurtenances commonly used upon or operated as a part of such rail or combined rail-and-water systems of transportation, to the end that such systems of transportation be utilized for the transfer and transportation of troops, war material and equipment, to the exclusion so far as may be necessary of all other traffic thereon, and that so far as such exclusive use be not necessary or desirable, such systems of transportation be operated and utilized in the performance of such other services as the national interest may require and of the usual and ordinary business and duties of common carriers.

"It is hereby directed that the possession, control, operation and utilization of such transportation systems hereby by me undertaken shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads."

The proclamation further provides:

"Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director may, by general or special orders, otherwise determine." Comp. St. 1918, § 1974a.

Thereafter Congress passed the act commonly designated the "Federal Control Act," approved March 21, 1918 (40 Stat. 451, c. 25 [Comp. St. 1918, §§ 3115¾a to 3115¾p]), whereby an elaborate system is prescribed for the possession, operation, and management under the President of the transportation systems thus authorized to be taken.

So far as here pertinent, it authorized the President, through contract with the owners, to provide for their just compensation for the use of the properties so taken and that any income derived from their operation in excess of such just compensation "shall remain the property of the United States," for the adjustment and payment as between the government and the owners of all taxes assessed against the property while so operated, for the right of the President to make betterments, extensions, and additions to any system, and the manner of financing the same, and for taking care of renewals, maintenance, repairs, and depreciation thereon, with authority in the President to prescribe "all other reasonable provisions," not inconsistent with the legislative authority conferred upon him, "that he may deem necessary or proper for such federal control or for the determination of the mutual rights and obligations of the parties." It empowers the President to initiate rates of fares, freights, and charges, and to fix the compensation of all persons employed in carrying on the operation of such transportation systems under federal control, and it appropriates the sum of $500,000,000, "together with any funds available from any operating income," to be used by the President "as a revolving fund for the purpose of paying the expenses of the federal control" and other purposes connected therewith. It provides:

Section 8: "That the President may execute any of the powers herein * * * granted him with relation to federal control through such agencies as he may determine."

Section 9: That the provisions of the act of 1917, first above mentioned, "shall remain in force and effect except as expressly modified and restricted by this act; and the President, in addition to the powers conferred by this act, shall have and is hereby given such other and further powers necessary or appropriate to give effect to the powers herein and heretofore conferred."

Section 10: "That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. * * * But no process, mesne or final, shall be levied against any property under such federal control."

Section 12: "That moneys and other property derived from the operation of the carriers during federal control are hereby declared to be the property of the United States."

And finally (section 16) it is provided:

"That this act is expressly declared to be emergency legislation enacted to meet conditions growing out of war."

After the passage of this act, the President, on March 29, 1918, issued his further proclamation wherein, referring thereto, he declares:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers and authority so vested in me by said act and of all other powers me hereto enabling, do hereby authorize the said William G. McAdoo, Director General of Railroads as aforesaid, either personally or * * * in the name of the President to" exercise all the powers conferred by

the act upon the President, "and to issue any and all orders which may in any way be found necessary and expedient in connection with the federal control of systems of transportation, railroads, and inland waterways as fully in all respects as the President is authorized to do, and generally to do and perform all and singular all acts and things and to exercise all and singular the powers and duties which in and by the said act, or any other act in relation to the subject hereof, the President is authorized to do and perform."

Thereafter, on October 28, 1918 (Comp. St. 1918, § 3115¾h), the Director General, in the administration of such federal control, issued his "General Order No. 50," whereby, so far as here pertinent, it was provided:

"Whereas, the act of Congress, called the Federal Control Act, approved March 21, 1918, provided that 'carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control, or with any order of the President'; and

"Whereas, since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising under federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits, and proceedings hereinafter referred to, based on causes of action arising during or out of federal control should be brought directly against the said Director General of Railroads and not against said corporation:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise: Provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures. * * *

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom."

The present action was commenced in January, 1919, and seeks damages from the defendant, a railroad corporation, for an act of negligence alleged to have been committed by it on July 8, 1918, through which plaintiff suffered injury to person and property, the theory of recovery, as disclosed by the averments, being that the defendant was at the time in the possession, control and operation of its railroad system and its accompanying facilities of transportation, and that it was through its tortious act in the management of one of its trains that the injury was inflicted.

[1, 2] A motion has been interposed by Walker D. Hines (the successor in office of Wm. G. McAdoo), as Director General of Railroads, joined in by the defendant, that he be substituted as the defendant herein and that the action be dismissed as to the present defendant, upon the

ground, duly made to appear by proper showing, that the latter was not at the time of the alleged injury, and has not been since the proclamation of the President first above referred to, in the possession, control, or operation of the particular line involved, or any of its lines of road or other transportation facilities pertaining to its system, but that the same were at the time of plaintiff's alleged injuries, and since at all times have been, in the exclusive possession and control and operated by the United States Railroad Administration under said Director General and his predecessor in office. The motion refers to the provisions of General Order No. 50, and proceeds upon the theory that such substitution is warranted by the terms of that order.

In response to the motion, the plaintiff, notwithstanding the averment of his complaint to the contrary, does not controvert the fact that defendant's entire railroad and transportation system was taken over at the date indicated in the moving papers, and has since been operated exclusively under federal control; but he challenges the validity of General Order No. 50 as an attempted exertion of power outside the legitimate limits of the authority intended to be vested in the executive by the legislation in question, and indeed as being beyond the power of Congress to so delegate, for the reason, as he asserts, that it involves a purely legislative function of prescribing rules of practice and procedure in legal actions and proceedings, a thing exclusively within the power of Congress; and, moreover, that the order is in direct conflict with section 10 of the Federal Control Act, which he asserts expressly authorizes the maintenance of the action against the present defendant.

It will readily appear, I think, that this contention of the plaintiff proceeds from a failure to apprehend fully the character and scope of the Federal Control Act, and more particularly the purpose to be subserved by section 10. In the first place, the act, as expressly declared, is an emergency measure, to meet extraordinary conditions growing out of an actual state of war, and calling for an exertion of the most extreme and drastic powers of government to meet those conditions. It is accordingly to be construed, not with that meticulous nicety which might be dictated by other circumstances, but in a broad spirit of liberality, in keeping with the purpose intended to be accomplished and having in view its emergency character.

As the terms of the act at once disclose, it was the purpose and intent of Congress that the possession and control of the systems of transportation taken over in whole or in part by the President was to be an exclusive one, to no extent shared in by the owners. If the latter or their officers were retained as operators, they were to act merely as servants and under pay of the government; and while the owners were to be compensated for the use of their properties, everything earned or accruing from their operation in excess of such compensation was to be the property of the government. Such a taking involved in no sense the element of agency by the government for the owners. Agency implies a consentual or contractual relation, but this was not such. It was more nearly analogous or akin to a taking by the sovereign in the right of eminent domain; and the result of

such a taking was necessarily to relieve the owners of systems so taken from any legal responsibility to the public arising out of their operation, and quite as necessarily an assumption of such responsibility by the government. And this, as is clearly shown by the whole framework of the act, was what Congress desired to accomplish. The conditions to be met in the emergency presented were deemed such that the administration of this vital instrumentality for successfully carrying on the war was to be freed for the time from any hazard arising through a divided control or responsibility. And as Congress could not in the nature of things foresee the many exigencies and necessities that might arise for prompt, free, and unrestrained action by the executive, in the practical administration of this great trust, the President was clothed with the broadest and most plenary powers and authority to deal with the problems as they might arise and in such manner as his judgment should dictate; and this not only as between the government and the owners, but as between the government and the general public, with express power to make all orders and regulations essential to carrying out the purpose of Congress.

This being the effect of the act, and I can see room for no other construction, the provisions of General Order No. 50 were quite in harmony with a correct interpretation of such purpose. While perhaps in a limited and technical sense the particular exertion of power embodied in the order may be said to involve the legislative function, it was not such in a sense that would render its delegation to the executive an excess of the power of Congress. It is not every such delegation of power that will be held to transgress the provisions of the Constitution defining the limitations between the legislative and executive departments of the government; and this act, I think, for the reasons suggested, should be held to present one of the exceptions. In many instances Congress, after clearly defining the purpose to be accomplished by its enactment, has given executive officers power to make such needful and proper rules and regulations for carrying out the purpose as their judgment and the necessities should dictate, and such regulations have been uniformly held to have the force and effect of legislation. Congress has gone so far as to provide that a violation of rules and regulations so made shall constitute a criminal offense. These principles are to be found in United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; Field v. Clark, 143 U. S. 649, 694, 12 Sup. Ct. 495, 36 L. Ed. 294; Arver v. United States, 245 U. S. 366, 389, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856; and many other cases to like effect. In Field v. Clark, it is said:

"The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation."

And in Arver v. United States (Selective Draft cases), where very extended powers were conferred upon the executive, the court, answering a similar objection say:

"We think that the contention that the statute is void, because vesting administrative officers with legislative discretion, has been so completely adversely settled as to require reference only to some of the decided cases. Field v. Clark, 143 U. S. 649 [12 Sup. Ct. 495, 36 L. Ed. 294]; Buttfield v. Stranahan, 192 U. S. 470 [24 Sup. Ct. 349, 48 L. Ed. 525]; Intermountain Rate Cases, 234 U. S. 476 [34 Sup. Ct. 986, 58 L. Ed. 1408]; First National Bank v. Union Trust Co., 244 U. S. 416 [37 Sup. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918D, 1169]."

The instant legislation, I think, falls clearly within the principles of these cases, and I am therefore of opinion that this order was well within the power of the Director General as the representative of the President. And certainly it was both a wise and expedient thing, and in the interest of the proper and orderly administration of justice, to direct that the defense in actions and proceedings for causes arising under government. administration and for which the latter, as we shall see, was alone answerable, should be in the name and under the direction and control of the government's representative. Indeed, it is doubtful if any judgment binding upon the government could be obtained, in an action so arising, to which its representative was not made a party.

Nor does the order in question contravene in any respect the provisions of section 10. It may readily be shown, I think, that the latter was not intended to apply to the class of cases provided for in that order. This is sufficiently manifest, perhaps, from the limitations of the section itself. The owners are to remain subject to all laws and liabilities as carriers *"except in so far as may be inconsistent with the provisions of this act * * * or with any order of the President."* (Italics volunteered.) It would seem obviously and at once "inconsistent" with the provisions of the act that liability should remain to the carriers for causes of action arising out of transactions with which they had nothing whatsoever to do and over which they had no control; and this language very clearly implies that Congress foresaw that such causes of action would necessarily arise under government operation for which the owners should not and indeed could not be made to respond; and as it could not anticipate and provide for the instances which might arise, it wisely left it to the President to regulate the manner in which such actions should be maintained.

But over and above this consideration, the situation presented is this: What was authorized by this legislation to be taken under federal control was specific property—that is, solely the transportation systems of the country—and that was all the proclamations of the President assumed to take into his control. The corporations owning these properties were not taken; they were left untouched and free to continue their functions as such in all respects other than in the operation of their carrier systems. Moreover, the legislation does not require the taking of every system nor all of any one system, but only to the extent deemed necessary for war purposes. This being the

case, Congress was bound to know that in the business transactions of these corporations, in activities as to which they were left in control, many obligations would be created and causes of actions arise in their dealings with the public, wholly unconnected with the operation and control of their transportation systems by the government and with which the latter would therefore have no concern as a party; it was bound to know, moreover, and doubtless had in mind, that many thousands of actions against these corporations would be pending in the courts throughout the country and many causes of action accrued, but not yet in suit, at the time federal control would be assumed, all arising prior to such taking and with which the government was not concerned.

With this situation in mind, Congress enacted the provision to be found in section 10, and it was not only a wise, but a necessary, provision for the protection of the rights of those dealing with these corporations, and to avoid what otherwise would have resulted in great confusion and uncertainty. But that it was intended as the purpose of section 10, as urged by plaintiff, to authorize suits against the owners of these properties in causes of action arising out of transactions had with the Federal Railroad Administration, or through torts committed by its agents while under its control—things for which, we repeat, the owners could be in no way responsible—may not for a moment be indulged; such a construction would clearly render the provision obnoxious to the objection of authorizing the taking of property without due process of law, a purpose which may not be imputed to Congress.

For these reasons I think the motion for substitution a proper one, and that it should be granted. It is so ordered.