## LANCASTER et al. v. MORGAN.
### (No. 2329.)

(Court of Civil Appeals of Texas. Texarkana. Jan. 25, 1921. Rehearing Denied Feb. 10, 1921.)

**1. Master and servant ⟪⟫113(4)—Leaving unblocked engine with defects releasing brakes unattended held negligence.**

Where there was evidence that an engine, with defects calculated to release, and which did release, the brakes if they were set, was left with steam up and unblocked on a down grade leading to the main line track where trains were frequently passing, and that it ran upon such track and collided with another engine, killing an employee, the jury had a right to find negligence in leaving the engine unattended under such circumstances.

**2. Master and servant ⟪⟫288(3)—Evidence of custom to leave engines unattended held insufficient to charge fireman with assumption of risk as a matter of law.**

In an action for the death of a railway fireman, killed when an engine left unattended on a side track ran upon the main track and collided with his engine, evidence *held* insufficient to show that a custom existed of leaving engines unattended, or that deceased knew of such custom, so as to charge him with assumption of the risk as a matter of law.

**3. Master and servant ⟪⟫97(5)—Injury by movement of unblocked defective unguarded engine held consequence reasonably foreseen.**

Where there was evidence that an engine, containing defects calculated to release the brakes, was left with steam up and unblocked on a down grade leading to the main track where trains were frequently passing, and that it ran upon the main track and collided with another engine, the jury was justified in finding that the employer should have foreseen the consequences resulting from the movement of the engine and owed employees working on the main track the duty to guard the engine, so that it would not move of itself or be moved by the acts of a meddler, and that, if he had performed such duty, the engine could not have gone upon the main track.

**4. Master and servant ⟪⟫96(2)—Failure to guard engine moved by trespasser held proximate cause of injury.**

Where it was the duty of an employer to guard an engine standing with steam up on a side track, and performance of such duty would have prevented a trespasser from moving it, so that it ran upon the main track and killed an employee, the failure to perform such duty was a proximate cause of the accident.

**5. Railroads ⟪⟫5½, New, vol. 6A Key-No. Series—Not liable for injuries during federal operation.**

A judgment against receivers of a railroad for the death of an employee during the time the railway was operated by the federal government through the Director General was erroneous.

⟪⟫For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Fannin County; A. P. Dohoney, Judge.

Action by Mrs. Walter Morgan, administratrix, against J. L. Lancaster and another, as receivers, and W. D. Hines, Director General of Railroads. From a judgment for plaintiff, defendants appeal. Affirmed as to the Director General, and reversed as to the other defendants.

January 5, 1919, appellant Hines, as Director General of Railroads, had charge of the Texas & Pacific Railway Company's line of railway and was operating same as a carrier engaged in interstate commerce. On the morning of that day Walter Morgan, while discharging duty he owed said Hines in such commerce as fireman on engine 247, was killed as the result of a collision between that engine and engine 794 in said railway company's yards in Texarkana. Morgan was 31 years of age at the time he was killed. Though serving as a fireman, he was an engineer by occupation. As a fireman he earned over $1,800 a year, and was capable, when working as an engineer, of earning $250 to $300 per month. He left his wife and two daughters, one and two years old, respectively, surviving him. This suit for damages for Morgan's death was commenced and prosecuted by his widow, as the administratrix of his estate, against said appellant Hines and against appellants J. L. Lancaster and O. L. Wallace, as receivers of said Texas & Pacific Railway Company, and resulted in the judgment in her favor for $30,000, from which the appeal is prosecuted.

It appeared from testimony heard at the trial that in said railway company's yards at Texarkana there were 27 tracks which led through open switches to the main track, over which about 25 passenger trains and many freight trains passed every day, and over which switch engines passed at frequent intervals. Derails to prevent engines from passing from the other tracks to the main track were not used. The tank in which water for use in engines was stored was on the track known as the "long alley track," which led to the "lead track," which in turn led to the main track, on which the accident resulting in Morgan's death occurred. The tracks specified were "down grade" from the water tank for about 350 feet, then "up grade" for about 100 feet, and then "down grade" again to the place where the collision took place. Engines held for use in taking out trains were kept under a shed. When one was needed for that purpose it was the duty of the "inside hostler" and his helper to take it from the shed to the water tank on long alley track, and there leave it in charge of the "outside hostler" and his helper. At about 30 minutes before the time when the train the engine was to pull was due to leave

it was the duty of the outside hostler and his helper to take the engine from the water tank and couple it to the train, which always was on some other track and never on long alley track, and there leave it in charge of the train crew.

With reference to the care taken of an engine after it was taken from the shed until it was coupled to the train, the testimony substantially was as follows:

Joe Redinger, the inside hostler, testifying as a witness for appellant, said it was the duty of the hostlers and their helpers "to keep a general lookout over all of the engines that were in the yard * * * up to the time the engine would be placed in charge of the train crew that was to carry the train out." "In a general way," he said, "it was their duty to see that nothing happened to the engine and that the engine did not do any damage to something else." He further said:

"No man was put there specifically as a watchman to keep people from getting on and off that engine. When we get an engine steamed up and ready to go out, as a rule we leave it there on the track and both the hostler and his helper would go off and leave the engine there unguarded."

And he further testified:

"As to the number of those watchmen that they have in the yards there at Texarkana: Well, in the daytime there it has been customary to have what is called a watchman in the house to watch the engines that way in the house, and then the outside hostler he has what he calls a helper, you know, and he watches the engines on what we call outside that way in the yard, and after they get ready to leave they are in his charge, and then the inside hostler he has one helper and he watches the others. That would be three men whose duty it was to look after the engines. It was the duty of these men to keep a general lookout over all of the engines that were in the yard and in the roundhouse and under steam, and also stored about close to the roundhouse. In other words, up to the time the engine would be placed in charge of the train crew that was to carry the train out, these men that have been referred to as watchmen and hostler's helpers would look after the engine and they would see that enough water was kept in the boilers to keep them from burning, and they would see that steam was kept on them. It was their duty to see that engines that were going to be used were kept hot and that they were not molested or interfered with. Q. And to see that they were not improperly moved or moved by people whose business it was not to move them? A. Well, I don't know that it was their business to do that, but I expect it would be. In the very nature of things it would be, if they were looking after them. It would be their business to see that nobody set an engine in motion or stole one; that would come under their head; they would stop that. I expect that would be their business."

Sam Carter, who was Redinger's helper, said J. G. Reinhardt was the outside hostler and that A. D. Lanier was his helper. He further testified:

"An engine watchman has to help the hostler and watch the engine too. What I mean by watching engines, after the work has been done they wait down on the track and keep them hot. They wait on all of them as far as that is concerned. That is what I mean by engine watchman. I mean that our crew would have nothing more to do with that engine after filling it with water. It was Lanier's, the helping hostler of Mr. Reinhardt, duty to put the ice and water in the cooler and fix her for the road in that respect, and he had to get up in the cab with the hostler, keep her hot and keep water in her while he put her on the train. Ordinarily and customarily there was not any engine watchman on the tracks for engines taken out and left as this was, only to keep water and steam up ready to start any time."

J. G. Reinhardt, the outside hostler, testified:

"Generally speaking, the outside hostler usually gets charge of the engine at the water tank from the inside hostler. Generally speaking, the outside hostler carries the engines from the water tank and puts them on the trains that they are to carry out."

J. G. Schepp, appellants' witness, and who was appellants' general foreman at the time of the accident, testified:

"Generally speaking, the duty of the inside hostler with reference to handling engines was to supply them with water and fuel and let them stand at the water tank. The general duties of the outside hostler were to take the engines from the water tank and put her on the train."

J. J. O'Connell, appellants' witness and master mechanic, testified:

"It is not the custom of well-operated railways to use a man as watchman to watch the engine, other than to supply her and prepare her for her runs. And in order that that may be done it is not necessary for a man to stay there all the time."

Cross-examined, the witness further testified as follows:

"Q. Well, is it not a fact that you don't expect an engine to be left unattended for any length of time? A. We expect them to be left in a safe condition. Q. And you don't expect them to be left unattended for any considerable length unless there is some emergency that calls for it, do you? A. Those engines are under the care of the hostler and it is strictly up to him to answer why he didn't leave her in safe condition, should anything happen. Q. In other words, if the engine gets away, it is up to him to explain it? A. He should explain it; he would be the first man I would go to to get an explanation. Q. The first thing is that he ought not to let it get away; that is the first impression? A. If it was found out it got away through some carelessness on his part. Q. Well the first proposition is that he ought not to let it get away and it calls for

explanation? A. It calls for an explanation. Q. Well, generally speaking, it is the duty of the hostler and his helper and the watchman, if there be a watchman also in service, to look after the engines and see that they are kept in workable condition; that they don't get away; is it not? A. It is their duty to handle the engines to and fro safely. Q. And to deliver them to the train, deliver them from the round-house to the train—for instance, if the inside hostler turns an engine over to the outside hostler, then it is the duty of the outside hostler to deliver it over to the train? A. Yes; that is his duty. Q. He is responsible for it until it is delivered to the train crew, is that correct? A. Well, I don't know just how you mean about responsible; some fellow may come along there during his absence after another engine, and run an engine into her or something, out of the yard. I could not, of course, hold him responsible in that case. Q. For some other fellow runing into him? A. Yes, sir. Q. I mean of that particular engine? A. It is his duty to supply the engine and keep it in condition to be dispatched. Q. And keep it under his supervision until she is delivered over to the train crew? A. It is his duty to know she has got fuel, presure of steam, and all supplies before she runs out of the yard. Q. And safely delivered to the train crew? A. Yes; she would be safely delivered if some fellow didn't run into him or something of that kind. Q. I mean though before he delivers it to the train crew? A. Well, he would know that she was properly supplied up and safe as far as steam is concerned; he is not hired as a watchman to guard her. Q. But it is his duty to carry it to the train? A. Yes, sir. Q. And his connection with the engine does not cease until he does carry it to the train, unless he is called away? A. Well, he might go after another engine. Q. But if he is not called away? A. It is his duty to put her on the train safely."

"In the fall or winter," using the language of a witness, "prior to the time the accident happened," the deceased had acted as hostler in said yards for about six weeks, during which time engines called for to take out trains were handled in the same manner 794 was handled on the morning when the collision occurred. On the occasion of the accident Redinger, the inside hostler, and his helper, Carter, ran engine 794 from the shed to the water tank, where he left it, with steam up, in charge of Lanier, the outside hostler's helper. Lanier later left it and went into the roundhouse, where he remained about 30 minutes, he said. While he was away the engine, because the brakes were not properly set, or because of defects which released them after they were set, or because of the act of a meddler, moved on long alley track to the lead track and then on to the main track, where it collided with engine 247, on which Morgan was at work, killing him.

Head, Dillard, Smith, Maxey & Head, of Sherman, for appellants.

Jones, Sexton, Casey & Jones, of Marshall, for appellee.

WILLSON, C. J. (after stating the facts as above). The Director General of Railroads insists the judgment should have been in his favor, and therefore that the trial court erred when he refused to instruct the jury to find for him, because the testimony, he says, did not warrant a finding that he was guilty of negligence in leaving engine 794 unattended on long alley track; or, if it did warrant such a finding, it conclusively appeared, he further says, that the risk due to leaving said engine unattended was one the deceased assumed.

[1] It is plain enough, we think, that the jury had a right to say from the testimony that the engine, with defects calculated to release, and which, if they were set, did release, brakes intended to hold it, was left with steam up and unblocked on a down grade leading to the main line track, to which it moved, where trains were frequently passing and where it collided with the engine on which the deceased was at work, killing him; and it is further plain enough, we think, that the jury had a right to conclude that leaving the engine unattended under those circumstances was negligence. Railway Co. v. Lafferty, 57 Fed. 536, 6 C. C. A. 474; Mars v. Railway Co., 54 Hun, 625, 8 N. Y. Supp. 107.

[2] The insistence that it appeared as a matter of law that the risk from leaving the engine unattended was one the deceased assumed is predicated on testimony set out in the statement above showing it to have been a custom known to the deceased, the Director General asserts, to leave engines unattended as 794 was left on the occasion of the accident. As we understand the testimony, it did not conclusively or otherwise appear that such a custom existed, nor, if it did, that deceased knew of it. The contention evidently is based on statements like those of the witness Redinger that "no man was put there 'specifically' as a watchman," and that it was the practice for hostlers and their helpers to "go off and leave engines" with steam up and unguarded on the track. When such statements are considered in connection with the other testimony, it is plain, we think, that what the witnesses making them meant was not that it was not the duty and practice of the hostlers and their helpers as such to keep watch on engines left as 794 was on the track, but that they were not employed exclusively for that purpose and given the name of "watchman." It is clear, looking to all the testimony, that it was the duty of the hostlers and their helpers to watch an engine intended for use as 794 was until it was coupled to the train it was to pull and placed in charge of the train crew, and we have found no testimony in the record showing that a hostler or his helper in charge of an engine ever, on any

other occasion than the one in question here, left it "unattended" in the sense that he went to a place where, if the engine began to move because of defects, or because the brakes were not set, or because of the act of a meddler, he probably either could not or would not discover the fact in time to stop it before it reached the main line track and collided with other engines or cars thereon.

[3, 4] On the theory there was testimony which warranted a finding that the moving of engine 794 to the main track was due to acts of a trespasser thereon, the Director General requested special charges which, had they been given, would have instructed the jury to find for him if they believed the engine was so moved. The refusal of the requested charges is assigned as error. The contention (which the Director General says, is supported by Seale v. Railway Co., 65 Tex. 274, 57 Am. Rep. 602; Railway Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; Railway Co. v. Bennett, 219 S. W. 197; and Mars v. Canal Co., 54 Hun, 625, 8 N. Y. Supp. 107) is that if the engine was moved by a trespasser his act, and not the conduct of the employee in charge of it leaving it unattended, was the proximate cause of the collision which resulted in the death of appellee's intestate.

As we understand them, the three cases first mentioned are so unlike this one in their facts as to render them of little value in determining the question made.

In the Seale Case a young girl was burned to death in an attempt to put out a fire negligently set out by the railway company on its right of way and which threatened to destroy property on the girl's mother's premises. The court held that the company's act in setting out the fire was not a proximate cause of the injury to the girl.

In the Bigham Case the point decided was that negligence of the railway company with respect to fastenings on the gate to its stock pen was not a proximate cause of injury to a shipper knocked down by cattle he had placed in the pen running against the gate in an effort, because of fright, to escape from the pen while he was endeavoring to fasten the gate with a rope.

In the Bennett Case the death of the railway company's employee was caused by his becoming overheated while fighting a fire negligently started in the company's yard by another employee, who caused the gas in an empty oil tank car to explode. The court held that the negligence of the employee who exploded the gas and so started the fire was not a proximate cause of the injury to the other employee.

The ruling in each of the three cases was on the theory that it appeared as a matter of law that an ordinarily prudent person would not have foreseen that injury to any one to whom he owed a duty might result from the negligence the court was considering.

The facts in the other one (Mars v. Railway Co.) of the cases cited were much like the facts in this case. There, at about 7 p. m., an engine, with steam up, was left on a side track with an employee whose duty it was to keep water in the boiler and take general charge of it overnight. At about 1 a. m. the employee left the engine and went to a switch shanty several hundred feet away. While he was at the shanty the engine moved south across several switches to the main track and then moved north on that track about half a mile, where it collided with a train. In that case, as perhaps it did in this one, the testimony warranted a finding that the engine was moved by a trespasser. Indeed, in that case the court assumed that the engine was so moved, and on that assumption said, with reference to the question as to the proximate cause of the collision:

"The injury to plaintiff for which this action is brought was not caused by the neglect of the defendant in leaving its car on the track. The injury was not the natural or ordinary result of such an act. It could not have been foreseen. Between the alleged negligence of the defendant and the accident intervened a willful, malicious, and criminal act of a third person which caused the injury and broke the connection between defendant's negligence and the accident. In fact, some person stole defendant's engine and sent it flying up the track, and this wicked, criminal act was the cause of the injury to the plaintiff, and defendant's act in leaving the engine where the criminal could start it was in no sense the proximate cause of the injury, or an act which ordinarily or naturally could have produced it."

We see no material difference between the Mars Case and this one, but we are unwilling to follow the ruling made there. We think the jury, on the facts of this case, had a right to say that an ordinarily prudent person should have foreseen the consequences which resulted from the movement of engine 794 to the main track, and therefore had a right to say, further, that the Director General owed the deceased the duty to use care to have the engine so guarded that it would not so move of itself or be so moved by the acts of a meddler. We think the jury also had a right to say that if the Director General had performed that duty the engine would not have moved onto said track either of itself or by the act of an unauthorized person. The duty of guarding the engine arose from the consequences to be expected if it moved without proper control to the main track, and if performance of that duty would have prevented a trespasser from so moving it we see no reason why failure to perform the duty should not be regarded as a proximate cause of the injury to the deceased. This view of the question made is supported by Railway Co. v. Lafferty, 57 Fed. 536, 6 C. C. A. 474, decided by the United

States Circuit Court of Appeals for the Ninth District. In that case two "live" road engines left overnight, with a switch engine, in the railway's company's yard in charge of one Riley, from a cause not shown by the testimony, moved from the track they were on to the main track and collided with a train thereon, killing Lafferty, who was a brakeman on the train. The negligence charged was a failure of the railway company to use due care to have the engines watched, the contention being that Riley alone could not properly watch them and perform other duties devolved upon him. There was testimony that the engineers who left the engines in the yard had been instructed by the company to group them and had failed to do so. On the theory that it appeared that the road engines were put in motion by some unauthorized person, it was insisted that, "if there was any negligence, it was not the negligence of the railway company, but the carelessness or negligence of the coemployees, either of the watchman [Riley] or the engineers who failed to obey their instructions in grouping their engines together, who were fellow servants with the deceased," which caused the accident. The trial court instructed the jury, other conditions he specified being complied with, to find for the plaintiff if they believed the appointment of Riley "to look after those engines," quoting, "and see that they were not tampered with or moved from their place, was a reasonable precaution to be taken by the company." In affirming a judgment in the plaintiff's favor the court said:

"We are of opinion the court did not err in declaring that the law imposed upon the railroad company the duty of taking reasonable precautions to see that the engines left upon its tracks at night in the yard at Fresno, with water in the boilers and fires burning, were not tampered with or moved; and that the court properly submitted to the jury the question whether or not the employment of only one watchman to perform that duty, it being also required of him to wipe the engines and put them in proper order for service the next day, was a reasonable precaution. * * * It is well settled that the master should not expose his employees, when conducting and carrying on his business, to perils or hazards against which they might be guarded by ordinary diligence and reasonable precautions on his part. The master is bound to exercise the care which the exigencies of the business in which he is engaged reasonably require for the protection of his employees. Hough v. Railway Co., 100 U. S. 213. Applying these principles to the particular facts of this case, we are of opinion that the railroad company would have been negligent to have allowed its engines to remain upon its tracks in the yard at Fresno without taking some precautions to provide against their being put in motion of themselves, or by the act of careless, thoughtless, or evil-disposed persons. Live engines, thus placed,

without any person to guard or take charge of them, are liable to be interfered with; and if, from any of the causes before mentioned, they should be started in motion, and run out upon the main track, and continue in motion, they would, in the very nature of things, become engines of great danger, imparting unusual peril and hazard to the lives and limbs of all the employees of the company who might be in charge of other engines and cars upon the main track. * * * The company is bound to take ordinary care to prevent such engines from running out from the side tracks, * * * where they are left, onto the main track, of their own motion, or from being run out by any interference of outside parties."

It is insisted the judgment was for a sum in excess of that warranted by the testimony, but we do not think it was, and overrule the contention.

[5] Assignments not disposed of by what has been said have received the consideration they seem to us to deserve, and we think none of them presents a reason why the judgment, so far as it is against the Director General, should be disturbed. We think, however, it is erroneous so far as it is against the receivers, for it conclusively appeared that the injury to Morgan occurred during the time the federal government, through the Director General, was operating the railway belonging to the company of which they were receivers. Nash v. Railway Co. (D. C.) 260 Fed. 280; Railway Co. v. Wilkerson, 224 S. W. 575. Therefore the judgment will be affirmed so far as it is against the Director General, and reversed so far as it is against the receivers, and judgment will be here rendered that appellee take nothing as against them.