## Akers, et al. v. Akers, et al.

(Decided June 23, 1922.)

### Appeal from Floyd Circuit Court

1. Deeds—Undue Influence—Mental Capacity.—The law looks with suspicion upon transactions between persons sustaining confidential relations toward each other, and where a father, who is old and physically infirm, conveys his land to a son who has cultivated his land and helped him look after his affairs, the burden is upon the son to show that the transaction was freely and voluntrily entered into and devoid of any vice rendering it inequitable or unfair, when the deed is attacked upon the ground of undue influence and mental incapacity.

2. Deeds—Setting Aside—Evidence.—Where the evidence does not show clearly that the price paid was adequate and does show that the grantor hardly knew what he was doing when he executed the deed, and where the son was doubtful of his father's capacity to make the deed and had been advised it would be risky, the deed will be set aside.

A. J. MAY and W. P. MAYO for appellants.

J. N. HAMILTON, SMITH & COMBS and COMBS & SMITH for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

This action by the other children and heirs of Rodman Akers, deceased, against his son, Kenas Akers, and the two infant children of his deceased daughter, Mindy Hamilton, attacks a deed which decedent executed and delivered to Kenas Akers about a year before his death, upon the ground of mental incapacity and undue influence.

The chancellor dismissed the petition, and plaintiffs have appealed.

Decedent was nearly, if not quite, eighty years of age when he executed the deed, and for some time prior thereto had been quite infirm, having suffered at least one and possibly two slight strokes of paralysis.

His son, Kenas, lived nearer him than his other children, and for quite awhile had been cultivating a part of his land for him and assisting him otherwise in the management of his affairs. The evidence shows without much contradiction that decedent had been for many years "queer," to employ the language of the witnesses, and had become quite childish in the latter years of his life; that at times he appeared perfectly rational, but that sometimes he hardly seemed aware of what was going on about him.

Just a short time before he executed the deed in question he united with the church, and when he was getting ready to be baptised, he not only removed his coat and shoes in accordance with the custom of the community, but was removing his trousers as well when he was stopped.

The deputy clerk who prepared the deed at the instance of Kenas, thus describes the manner of its execution:

"Q. Did you have a conversation with the old man, Rod? A. Yes, sir. Q. About the land—go ahead and tell the court about the transaction? A. I asked the old man to give me a description of the land, and he did so, according to what the deed said; other parties had wrote the deed heretofore, and I had the boundary and I took the boundary from their deed. Q. Did he go ahead and point out the boundary lines to you? A. He told me the boundary lines; named some trees; I asked him why he was selling the land, etc., and he remarked saying he wanted Kenas to have the land because Kenas had taken care of him, and he needed the money to live on; he didn't expect to live very long no way, and he needed the money. And I asked him did he think he was getting a fair price for his land, and he said he thought he was. That was about all he said. . . . . Q. What seemed to be the condition of the old man's mind at that time, the day the deed was wrote? A. That was the only time I ever saw the old man; he seemed to be in good mind —talked sensible. Q. You think he was fully capable of making the conveyance, making the deed? A. Under the circumstances, I wouldn't think he was. Q. Why

do you mean to say you do not think he was? A. He was so weak, at times his mind would come and go; he seemed to be delirious sometimes. Q. I believe you told the stenographer a few minutes ago the old man's mind on that day was good, is that the statement you made? A. A few minutes ago—on that day. Q. His mind seemed to be clear and all right? A. Before the deed was taken, at the time the deed was taken, just a few minutes before the deed was executed, he was very delirious, it seemed like, just before the deed was taken. Q. Was he able to point out the boundary? A. At the time the deed was executed? Q. And talked sensible to you? A. Yes, sir, at the time the deed was executed, but before that he seemed to be very delirious. Q. The old man seemed to take spells, did he? A. Yes, sir. Q. Was he in bad health? A. Well I couldn't say he was in bad health, but he had to be carried in a chair. Q. He was getting quite old, wasn't he, Leonard? A. Yes, sir, he seemed to be away up in years; I don't know how old he was. . . . Q. I will ask you if Rod Akers acknowledged that deed? A. Not in words. Q. What did he do, if anything? A. His wife held his hand on the pen and make his mark. Q. You mean his wife, Frankie Akers, held Rod Akers' hand on the pen while he made his mark? A. Yes, sir. Q. Wasn't Rod Akers able to hold his hand on the pen by himself? A. He didn't seem to understand what I wanted when I offered him the pen, and his wife placed his hand on the pen. Q. Do you mean to say that his mind was in such condition that he didn't know what he was doing when you offered him the pen? A. His mind seemed to be at a loss at that instant. Q. And did he say anything after his wife held his hand on the pen and the mark was made? A. I couldn't say; I don't think he did; I don't remember."

The consideration stated in the deed is $700.00, and the amount actually paid by Kenas to his father was $650.00, in explaination of which he testifies as follows:

"Q. When did you pay for this property? A. Paid for it when I got the deed. Q. How did you pay for it? A. Give them a check and the money, and took it and put it in the bank for them. Q. Do you mean that you give them a check for the full amount of $700.00? A. No, sir, $650.00. Q. I believe the consideration expressed in the deed is $700.00? A. Yes, sir. Q. When did you pay the other $50.00? A. Well, I paid it along;

I paid their taxes, and ginned around for them, and worked and waited on them; I have been waiting on them for a good long while. Q. Do you mean to say that you had paid that $50.00 prevous to the time you give the check for $650.00? A. Yes, I paid it long before. Q. Was it the understanding between you and your mother and your father at that time that $50.00 of the money had previously been paid in the way of taxes, work, etc., in money you had spent for them? A. No, they never said nothing about that; never said nothing about that. Q. Why did you just give your check for $650.00? A. That was all I had at that time; all I could pay at that time. Q. What did they say as to that payment? A. That was all right with them; yes, sir, that was all right.''

The land is described in the deed by reference to the lines of abutting property, branches, drains, trees, etc., and it is impossible to determine even approximately from the description, how many acres are conveyed, but it is stated that the boundary contains ''75 acres, more or less.'' It is equally impossible to ascertain from the testimony the quantity of land covered by the deed. Such witnesses as would venture an opinion upon the question of its value fixed it from eight to thirteen dollars an acre, but no witness testified as to its value as a whole except Robert Frazier, who fixed it at seven or eight hundred dollars, after stating in answer to what he considered it worth, ''I'll be dogged if I hardly know, wouldn't hardly know how to guess at it.''

Two witnesses testified that a short time before the execution of the deed, Kenas asked them if in their judgment his father was capable of making a deed, and both replied that they wouldn't like to risk it.

The law looks with suspicion upon transactions between persons sustaining confidential relations toward each other, and if a person who is old and physically infirm transfers his property to one sustaining a confidential relationship and who has custody of or resides with him, the burden is cast upon the grantee to show that the transaction was freely and voluntarily entered into and devoid of any vice rendering it inequitable or unfair. Davidson v. Davidson, 180 Ky. 190, 202 S. W. 493; Sword v. Fields, 192 Ky. 629, 234 S. W. 202.

We think the facts of this case clearly bring it within this rule, and that Kenas Akers failed to sustain the bur-

den which that rule cast upon him. The transaction was devoid of inequity and unfairness only if the price paid was adequate, and this is by no means clearly established. That the deed was not the conscious act of the grantor seems clear from the testimony of the clerk before whom it was executed, and no part of this testimony is contradicted by any one.

In these circumstances, it is our opinion that to uphold the deed would be inequitable and unjust, while to set it aside cannot work an injustice upon any one, since the grantee will be allowed a lien upon the land for the amount he paid therefor, with interest, less the reasonable rental value of the land, and he cannot justly complain of such a judgment, having taken the deed when he was doubtful of his father's capacity to make it, and after having been advised that to do so would be risky, and having failed to show clearly that the consideration was adequate.

Wherefore the judgment is reversed, and the cause remanded for proceedings consistent herewith.