## McDonald, et al. v. Baker, Executrix, et al.

(Decided February 13, 1925.)

### Appeal from Lee Circuit Court.

1. Evidence—That Values of Oil Leases are Speculative and Uncertain in Early Stages of Oil District Development Held Matter of Common Knowledge.—It is common knowledge that the values of oil leases in the early stages of development of the district change quickly and greatly at a time of high public excitement where wells are being drilled, some of which prove productive and others mere dry holes.

2. Mines and Minerals—Physician, Friend, and Associate of Grantor Required to Show Utmost Good Faith in Procuring Conveyance of Valuable Property for Nominal Consideration.—Where attending physician alone or in concert with his son procures a lifelong partner, friend, and associate to transfer valuable oil lease to the son for a nominal consideration during grantor's last illness, he ought to be required to prove by clear and convincing evidence that he made full disclosure of the facts and dealt fairly with the grantor.

3. Mines and Minerals—Evidence Held Insufficient to Show Full Disclosure to Grantor Conveying to Son of Grantor's Physician.—Evidence held insufficient to show full disclosure to grantor at time of conveyance of interest in oil lease while he was hopelessly ill, to son of his physician for an inadequate sum of money.

4. Mines and Minerals—Evidence Held to Warrant Chancellor's Finding that Grantor's Physician and Grantee were Acting in Concert to Obtain Conveyance.—Evidence held to warrant chancellor's finding that grantee and grantor's physician were acting in concert to procure conveyance of interest in oil lease for grossly inadequate price.

5. Cancellation of Instruments—Wife, Joining in Conveyance to Son of Attending Physician During Husband's Last Illness, Held Not Estopped to Sue for Cancellation.—Wife was not estopped from suing, as executrix of her husband's estate, to cancel a deed from her husband, made during his last illness to the son of his physician, merely because she joined in the conveyance rather than by opposing him at that time to increase his worries.

6. Cancellation of Instruments—Wife and Executrix Held Not to have Ratified Deed Because as Notary She Took Acknowledgment of Parties to Another Contract Involving Premises.—Wife and executrix of grantor held not to have ratified deed made by decedent during his last illness to the son of his physician because she, as notary public, took acknowledgment of party to a subsequent contract involving the property.

7. Cancellation of Instruments—Wife and Executrix Held Not Barred by Laches from Suing to Cancel Deed Obtained from Husband During Last Illness.—Wife and executrix of deceased grantor suing to cancel for fraud deed to son of decedent's physician held

not barred by laches because of 14 months' delay in instituting action, where she endeavored to procure grantee to reconvey and met with difficulty in finding counsel to represent her.

8. Equity—Mere Delay Not Working Disadvantage to Another is Not "Laches."—"Laches" is not mere delay, but delay that works disadvantage to another.

RODES & HARLIN, SAM HURST, E. B. ROSE, and CARTER D. STAMPER for appellants.

BLAKEY & BLAKEY and HOBSON & HOBSON for appellees.

Opinion of the Court by Judge Clarke—Affirming.

During 1916, and at the beginning of the oil excitement in Lee county, Kentucky, Doctors G. S. McDonald, L. F. Gibson and C. E. Baker, who resided in the village of Heidelberg, in that county, jointly acquired leases on twenty or more tracts of land. Dr. Baker was a notary public and took the acknowledgments to several of these leases, and in such cases the leases were taken in the name of his wife and the other two doctors, but that Dr. Baker and not his wife was the real party in interest in all of these leases is not disputed.

In May, 1917, Dr. Baker became desperately ill, was operated upon in October, and died in November of that year. On October 14th, and just a few days before the operation, he and his wife conveyed his undivided one-third interest in one of these leases, taken in his wife's name and known as the "Williams" lease, to Chester McDonald, a son of Dr. McDonald, for thirty dollars. In the summer or fall of 1918, oil was struck on this lease, and about $60,000.00 worth of oil was sold therefrom within a few months.

In January, 1919, the wife of Dr. Baker, as executrix and sole beneficiary under his will, instituted an action against Dr. McDonald and his son Chester to cancel the deed to Chester for Dr. Baker's interest in the Williams lease, and for an accounting, upon the two grounds that it was procured by fraud upon the part of the McDonalds acting in concert, and that Dr. Baker did not have mental capacity to make it. A demurrer was sustained to that petition and it was dismissed, which judgment was affirmed by this court in Baker v. McDonald, 185 Ky. 470, 215 S. W. 292, because of insufficient allegations of fraud and mental incapacity. Mrs. Baker then filed this action against Dr. and Chester McDonald

for the same relief and upon the same grounds. A demurrer was also filed to this petition, but it was overruled, issues formed, and a trial had resulting in a judgment canceling the deed and a recovery by Mrs. Baker from Dr. and Chester McDonald for $2,500.00, as the amount of royalties received by the latter under the canceled deed.

For reversal of that judgment counsel for appellants insist, first, that the evidence does not sustain the alleged conspiracy between Dr. McDonald and his son, Chester, or that the deed was procured by fraud, or the allegation of mental incapacity; and, second, that it does show that Mrs. Baker subsequently ratified the deed and was guilty of such laches as to defeat a recovery by her.

Both Dr. McDonald and his son Chester positively deny that the former had any connection whatever with the latter's procurement of the deed from Dr. Baker, or even knew thereof until after the trade had been consummated, and no one directly contradicts their testimony. But this is nearly always true with reference to a conspiracy charge, which of necessity must usually be established, if at all, by circumstantial evidence, and it is upon such evidence that plaintiff had to and does rely to sustain her charge of a conspiracy. As such evidence cannot be separated from that of fraud and mental incapacity, no attempt will be made to do so, but these three questions will be considered together.

Chester McDonald was unmarried and lived with his father; they were partners in the drug business, conducted in a building owned by Dr. McDonald, and in which he had his office. Doctors McDonald and Baker had been friends for many years, and were partners in the procurement of these oil leases. Dr. McDonald was also Dr. Baker's physician throughout his illness and at the time the deed was procured from the latter by Chester McDonald. Both Dr. and Chester McDonald knew that Dr. Baker was at death's door from Bright's disease, aggravated by an enlarged heart, high blood pressure and extreme shortness of breath, and that morphine was being administered daily to ease his pain. Dr. McDonald also knew, as did probably his son and everyone else in the village, that Dr. McClymonds of Lexington, when in July he was consulted as a specialist, had advised that Dr. Baker could live but a short time; that he should go home, go to bed, do absolutely no work, rest, avoid excitement or worry of any kind, and that disregard of

these instructions might cause instant death. Both also knew that the operation was to be performed in a few days, and Dr. McDonald knew that the operation was both useless and hopeless, for he had so advised.

Chester McDonald never visited Dr. Baker during his illness except upon the one occasion when he purchased his interest in this single lease, which was done within less than an hour after the injection of one-fourth grain of morphine. According to the evidence of Mrs. Baker and her daughter, a few days theretofore Dr. McDonald had told Dr. Baker that their title to this lease was being questioned, which was true, and that they were about to lose it, which was not quite true. He denies this latter statement, but admits talking with Dr. Baker about the title to this lease and claims to have fully explained the whole controversy to him. Mrs. Baker and her daughter also state that Chester, on his visit, referred to Dr. Baker's protracted illness and consequent need of money, and said they were sure to lose their title to this lease, but that he could turn it over for a quick profit, and thereupon offered to buy it for $5.00; that they haggled over the price for some time, and until Dr. Baker agreed to take $30.00, when the trade was closed. Chester says the lease was first spoken of by Dr. Baker, that he offered $20.00 for it, and closed the deal when Dr. Baker agreed to take $30.00. He also denied making the statements about the title, or that he wanted the lease simply for a quick turnover.

That this lease was by far the most valuable of those owned by the three doctors was proven by subsequent events, but its value at that time was speculative and uncertain. That such values change quickly and greatly, especially where, as in Lee county at that time, excitement is high and wells are being drilled, some proving dry and others productive, is matter of common knowledge. Oil had been discovered within three or four miles both to the north and west of this land, and this lease at least had such speculative value as that no prudent, capable business man would have surrendered it for $30.00, or at all without careful examination and accurate information about proposed and existent operations in its immediate vicinity.

That Chester selected for purchase Dr. Baker's interest in this particular lease that so soon proved a "gold mine," and did not resell it for a quick profit, or at all, is at least suggestive that he bought it to keep and

knew something about its value that Dr. Baker did not know. And that Dr. McDonald regarded his interest as of greater value than $30.00, despite the controversy about the title, is shown by his refusal a short time theretofore to surrender his like interest therein for a slightly larger sum, of which Chester also knew, and of which presumably Dr. Baker was not informed by either Chester or his father.

There had been no suit filed challenging the *prima facie* validity of this lease, but the lessor was threatening to sue, claiming it was invalid, and had executed a top lease on the land. In March, 1918, that controversy was settled by recognizing both leases as valid and dividing interests, and shortly thereafter operations were begun on the land and royalties began to come in in September.

At the time of the trade Dr. Baker was a hopeless wreck physically, and while he still possessed sufficient mentality to talk intelligently, comprehend what was said to him and understand in a general way what he was doing, it is perfectly clear that he had neither the mental nor physical vigor to inform himself as to the real or speculative value of this lease, and was utterly incapable of making any trade with reference thereto on equal terms and at arm's length with the alert, capable and informed son of his friend, partner and physician.

Chester McDonald never visited Dr. Baker during his illness except upon the one occasion when he went to his home for the purpose of buying his interest in this one of all of the leases in which his father and Dr. Baker were jointly interested. If Dr. McDonald had been the purchaser, there can be no doubt about the duty of the chancellor to cancel the deed and require an accounting, since because of the confidential relationship existing between him and Dr. Baker as physician and patient, in addition to being long time friends and partners in the oil business, the burden would have been upon him to prove by clear and convincing proof full disclosure and the utmost fair dealing. McElwain v. Russell, 11 Ky. L. R. 649, 12 S. W. 777; Hoeb v. Machinot, 140 Ky. 330, 131 S. W. 23; McDowell v. Edward's Admr., 156 Ky. 475, 161 S. W. 534; Watson v. Watson, 190 Ky. 270, 227 S. W. 524; Akers v. Akers, 195 Ky. 461, 243 S. W. 9.

This burden he neither assumed nor met, and the case is just the same if he and his son were acting in concert in procuring the deed. Hence this latter question is

the crucial one in the case, and upon that question the evidence is such that we do not feel warranted in disturbing the finding of the chancellor. We need not, therefore, discuss whether or not, if the burden had been upon plaintiff to prove fraud the judgment would be sustained, or refer to the cases upon which appellants rely for a reversal, since all of those cases deal with transactions where the parties were dealing at arm's length and no confidential relationship existed.

According to the evidence for the plaintiff, Dr. McDonald, a few days prior to Chester's visit, told Dr. Baker that they were going to lose title to this lease, when he knew his patient was in no condition to be worried about his business affairs. Chester, on his visit to buy this particular lease of all those owned by the partnership, reiterated and enlarged upon these representations to the extent already indicated, whereby he induced Dr. Baker to believe that his interest in this lease was of practically no value and to sell it for a grossly inadequate price.

That neither Dr. McDonald nor Chester made full disclosure of their knowledge as to the condition of the title or the value of the lease is strongly indicated by the facts that the dispute about the title was so soon settled and that Dr. Baker took less than Dr. McDonald had refused for his like interest therein. According to his own admissions, Chester tried to buy it for 50 per cent less than he paid, and according to the plaintiff's evidence, for only $5.00. Although all of the royalties on this lease were paid to Dr. McDonald as trustee, both he and Chester professed ignorance as to the amount received on the interest purchased from Dr. Baker, and their estimates thereof are grossly contradictory.

When Mrs. Baker sought a rescission, or as she states, tried to "buy back" the interest from Chester, Dr. McDonald intervened angrily and said, "They would not sell the lease back." The inference from this evidence is not only reasonable, but almost unescapable, that the two were acting in concert, and by their joint actions convinced Dr. Baker that his interest in this lease was of practically no value and thereby induced him to sell it for a grossly inadequate price, without full disclosure, and at a time when he was neither physically nor mentally capable of meeting them at arm's length, or upon even terms.

The fact that many of these circumstances, as well as the inferences above indicated, are denied by Dr. McDonald and his son, but puts in issue the ultimate fact and as before stated, upon that issue we must accept the chancellor's finding.

This leaves for decision whether or not Mrs. Baker is estopped to complain for any of the several reasons urged.

The fact that she joined with her husband in the deed under the circumstances, and as she explains to avoid worrying or opposing him at that time, certainly does not estop her from thereafter seeking an avoidance of same.

Ratification of the contract by Mrs. Baker is asserted because of the fact that in March, 1918, she, as a notary public, took acknowledgment of the wife of Dr. Gibson to the contract whereby the dispute as to the title to this lease was settled with the owners of the top lease.

Mrs. Baker was in no sense a party to that transaction. She at most is estopped to complain thereof, and she does not do so. The compromise was as desirable and beneficial to her as to the McDonalds, but not more so. It altered their attitude toward each other in no way or degree. Her refusal to act as she did would not have prevented any other proper officer from doing so. Her relationship to the McDonalds was but little different from that of her husband. Considering all of these circumstances, together with her inexperience, recent grief, and the many burdens that the death of her husband had cast upon her, it would be extremely harsh and inequitable to hold that the fact, as a notary, she simply took the acknowledgment of Dr. Gibson's wife to the compromise agreement, barred her right to question the validity of the deed to Chester McDonald, when nothing was done by her or had happened that placed him in a worse position with reference thereto or a restoration of the *statu quo ante.*

We therefore conclude that, considering the confidential relationships that had existed between the McDonalds and her husband, and in a measure between them and her, she should not, three months after the death of her husband, be held to such strict accountability that a mere clerical connection with this compromise agreement ought, in justice or equity, to be construed as a ratification of the fraud practiced upon her husband, and through him upon her.

The final contention is that in waiting 14 months before instituting an action to set aside the deed, Mrs. Baker was guilty of such laches as defeats her right to such relief.

Previous to instituting the suit, she had tried to get Chester McDonald to sell her the lease back, and offered to return the $30.00 he had paid for same. She says in one place in her testimony that this occurred shortly after her husband's death, and in another states, as do the McDonalds, that it was but a short time before the institution of the first action. Two lawyers refused to take her case, and Dr. McDonald, when she tried to get Chester to sell her the lease back, not only exhibited anger toward her for so doing, but accused her of trying to get the lease back, not because of any fraud in the execution of the deed to Chester, but because since then the lease had become valuable. Hence the delay was neither unexplained nor unreasonable under the circumstances.

Besides, laches is not mere delay, but delay that works a disadvantage to another. McKenney v. Page, 146 Ky. 682, 143 S. W. 382; Culton v. Asher, 149 Ky. 659, 149 S. W. 946; Radford's Admr. v. Harris, 144 Ky. 809, 139 S. W. 963.

Such delay as there was worked no disadvantage to the McDonalds, and it is therefore clear that the plaintiff is not guilty of such laches in this case as to defeat her right to a recovery.

Judgment affirmed.